**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 17 2012, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT T.B.:

**DEIDRE L. MONROE**
Public Defender's Office
Gary, Indiana

ATTORNEY FOR APPELLANT C.R.:

**JOANN M. PRICE**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**EUGENE M. VELAZCO, JR.**
DCS, Lake County Office
Gary, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

ATTORNEY FOR COURT APPOINTED SPECIAL ADVOCATE:

**DONALD WRUCK**
Wruck Paupore, PC
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) | |
| A.R., V.R., C.R., and K.B. (Minor Children), | ) ) | |
| and | ) ) | |
| T.B. (Mother) and C.R. (Father), Appellants-Respondents, | ) ) ) | |
| vs. | ) ) | No. 45A03-1201-JT-38 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, Appellee-Petitioner, | ) ) ) ) | |

|                              | )  |
| :--------------------------- | :- |
| and                          | )  |
|                              | )  |
| LAKE COUNTY COURT APPOINTED  | )  |
| SPECIAL ADVOCATE,            | )  |
|    Guardian Ad Litem. | )  |

---

APPEAL FROM THE LAKE COUNTY SUPERIOR COURT
The Honorable Mary Beth Bonaventura, Judge
The Honorable Matthew B. Gruett, Referee
The Honorable Terry A. Wilson, Referee
The Honorable Charlotte A. Peller, Judge Pro Tempore
Cause No. 45D06-1009-JT-176
Cause No. 45D06-1009-JT-177
Cause No. 45D06-1009-JT-178
Cause No. 45D06-1009-JT-179

---

**October 17, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellants-respondents T.B. (Mother) and C.R. (Father) appeal the involuntary termination of their parental rights as to their minor children, A.R., V.R., and C.R.Jr., and Mother also appeals the termination of her parental rights as to K.B., a minor child born of a prior relationship.[1] Both Mother and Father allege that the Indiana Department of Child Services (DCS) failed to present sufficient evidence to support the trial court's order terminating their parent-child relationships as to these children. Concluding that the DCS met its burden, we affirm the judgment of the juvenile court.

---

[1] The parental rights of K.B.'s father, W.F., were also terminated, but he does not participate in this appeal.

FACTS

In June 2007, the DCS received a report that Mother's five children, D.B.,[2] K.B., A.R., V.R., and C.R.Jr. (collectively, "the Children") were going to school dirty. A DCS family case manager (FCM) investigated and found the Children wearing unclean clothes and Mother's home to be without gas and dirty, but "correctable." State's Ex. A p. 3. Mother then moved to a new home where, due to unpaid bills, she could not secure electricity or gas. On July 12, 2007, the DCS took temporary custody of the Children and subsequently filed a petition alleging that the Children were children in need of services (CHINS).

On July 17, 2007, the Children were adjudicated as CHINS. The juvenile court ordered that the DCS provide the following services: psychological and drug/alcohol evaluations for Mother, parenting classes for Mother and Father, and random drug screens for Mother and Father. The court also ordered the DCS to pay Mother's overdue bills and to return the Children to Mother's custody once she had utilities again. Accordingly, the Children returned home shortly.

At a dispositional hearing on August 22, 2007, Mother and Father were ordered to participate with the case plan. In early 2008, the DCS assisted Mother with paying the security deposit and first month's rent at another new home. The DCS also helped Mother purchase beds and school uniforms for the Children. In May 2008, Mother

---

[2] The termination of Mother's parental rights as to D.B. was taken under advisement by the trial court. Consequently, this appeal does not concern Mother's parent-child relationship as to D.B.

moved again, and the DCS helped Mother purchase appliances and more new beds for the Children.

During this time, Mother participated in the services referred by the DCS. Specifically, Mother completed a psychological evaluation whereby she was diagnosed with bipolar disorder, depression, and anxiety. Mother also completed parenting classes, and her substance abuse evaluation indicated no substance abuse issues. Mother's drug screens were clean. Based on the psychological evaluation, the DCS referred Mother for individual therapy, and she received free psychotropic medication through a provider. The DCS also referred Mother for home-based casework services.

Despite these services and the school's attempts to engage Mother, the Children continued "doing poorly in school" and going to school unclean. Tr. p. 89. The school sometimes provided clean clothing for the Children. Although Mother had adequate financial resources, she continued to struggle with budgeting. Service providers described Mother as "resistant" and unreceptive to their recommendations. Id. at 82. In September 2008, Mother moved again after receiving an eviction notice.

Father also completed parenting classes and random drug screens, some of which were positive for marijuana. The drug screener was often unable to reach Father for random screens, which resulted in a number of "no shows" and ultimately the referral being "closed out" by the provider. State's Ex. D p. 6, 9; Tr. p. 102. In late 2008, Father requested services again, but he stated that "he didn't have permanent housing so no one would be able to come out and do the urine screen[s.]" Tr. p. 103. After the FCM set up

random screens for Father at a provider's location, the FCM was unable to contact Father, and he failed to follow up with her again at that time.

In December 2008, the juvenile court threatened to remove the Children due to Mother's noncompliance but gave Mother until the end of January to comply. Nevertheless, in January, Mother began "to quickly regress." State's Ex. C p. 23. Consequently, her therapist recommended that the Children be removed.

In March 2009, the DCS investigated a report that Mother was "stealing utilities from a neighbor." Tr. p. 87. Because Mother had no electricity, the Children were still struggling in school and going to school unclean, and Mother was not adequately addressing these issues, the Children were removed and placed into foster care. Mother, however, refused to acknowledge that she was at fault in any way for the Children's removal. Rather, she insisted the DCS should have just paid her bills.

When the Children were removed in March 2009, Father "wasn't an option" for placement of his children because he was not in compliance with the DCS case plan. Id. at 103. Mother was allowed supervised visitation with the Children. During one of Mother's supervised visits, Father visited with his children without authorization from the juvenile court or the DCS. The FCM informed Father of a policy that he needed to pass a drug screen before he could visit with his children.

Mother moved again in May 2009. In June, the juvenile court moved Mother's supervised visits to her home and ordered Father to have visits once he produced a clean drug screen. In September 2009, Mother began "to display progress in providing a stable

5

environment for her children." State's Ex. C p. 38. Mother was permitted increased unsupervised visitation with the Children, up to and including unsupervised day and weekend visits.

Sometime during this period, D.B.[3] was placed back home with Mother. On December 28, 2009, the juvenile court ordered the rest of the children returned to Mother's home. The DCS was ordered to provide individual counseling for the Children and family counseling for Mother and the Children.

Almost immediately after the Children were placed back into Mother's home, there were problems. Mother appeared "overwhelmed" and displayed "no control" over the Children. Id. at 44, 47. She resisted the recommendations of the service providers and stopped taking her medication. Meanwhile, the Children continued going to school unclean and appeared "fearful of opening up" during therapy sessions. Id. at 51. In February 2010, the four oldest children were each suspended from school at least once.

On April 14, 2010, the juvenile court again ordered the removal of the Children after Mother failed to timely obtain medical care for K.B., who had suffered an injury to her foot, and also because of Mother's overall regression in her parenting. The Children were all placed into the same foster home and had weekly supervised visits with Mother.

While the Children were in foster care, it was determined that they had been sexually perpetrating on each other for some time while in Mother's care. The Children reported that these sexual acts, at first forced by D.B., started after they watched a

---

[3] D.B. had been in a different foster placement than his siblings.

pornographic video that their maternal grandfather gave them. The Children also reported that they had "witnessed [Mother] having sex with various different people." Id. at 167.

In May 2010, a parenting assessment concluded that Mother was at a "moderate to [high] risk for neglect and/or abuse to children." Id. at 57, 69. Moreover, the relationship between Mother and the Children was described as one of "mutual indifference." State's Ex. B p. 6. Over the next few months, Mother tested positive for marijuana three times. Mother was referred for substance abuse counseling, but she failed to comply with this provider.

In June 2010, Mother received a new therapist. Mother missed twenty-four of thirty-three scheduled appointments with this therapist, and she was significantly late for seven of the nine appointments that she did attend. Mother missed three of these appointments because she was in jail for an unknown reason. The DCS also referred Mother for homemaker services and for personalized parenting education. Although Mother completed the parenting education, she "struggled with . . . applying some of the skill sets" to actual parenting scenarios, and the provider believed Mother "was not able to provide effective parenting." Tr. p. 272, 274.

On July 28, 2010, the juvenile court changed the permanency plan for the Children from reunification to termination of parental rights and adoption. On September 30, 2010, the DCS filed its petition to terminate the parental rights of Mother and Father.

In November 2010, Mother self-enrolled in services at the Indiana Parenting Institute. Specifically, Mother participated in a ten-week program that included a third parenting education class, as well as mentoring, job skills, and volunteering components. Mother completed this program and received a certificate of completion and a certificate for being "The Most Improved" in parenting and life skills. Mother's Ex. 3 p. 1.

Nevertheless, during Mother's supervised visits, several "disturbing" issues were noted. Tr. p. 191. Mother only gave positive attention to D.B., which would "enable his very inappropriate behavior" and cause the other children to misbehave to garner attention. Id. at 193. Mother allowed the Children to destroy items in the visitation rooms, and she appeared unable to provide effective discipline. On March 4, 2011, the juvenile court ordered that Mother's visits be supervised by a therapist.

Patricia Lawson was referred to provide therapeutic intervention during the visits. After observing a few visits, Lawson noted that Mother lacked empathy for the Children, often mocked and demeaned them, and "had a difficult time with touching her children or allowing her children to touch her." Id. at 62. Mother made "some attempts" at change, but her attempts appeared "mechanical" and were short-lived. Id. After eight weeks, Lawson recommended that Mother's visitation stop at once because "the children's behavior was deteriorating[,]" and they seemed "uncomfortable and confused by the visits." Id. at 65. On May 23, 2011, the juvenile court suspended Mother's supervised visits. At this time, Mother was also "homeless" and "staying in shelters." Id. at 145.

Meanwhile, Father again contacted the FCM seeking to participate in services. The DCS referred Father for individual counseling, more parenting classes, home-based casework services, and random drug screens. Although the referrals were made in March 2011, Father did not begin participating until June, and even then, he missed a number of scheduled appointments. Father's drug screens were now clean, but the juvenile court refused to allow him supervised visits with his children.

After Father began participating in services, it was discovered that he "had a problem with alcohol." Tr. p. 164. Father admitted that when "he was in the home, he would come home intoxicated, passed out, and the children were asking him not to drink anymore." Id. at 175.

Moreover, it was discovered that Father blames the Children and Mother for his children being removed but does not recognize his own role in the removals. Throughout the case, Father never paid Mother any child support or otherwise provided care or financial support to his children. In addition, although Father knew that his children were going to school dirty, he did nothing to correct this issue. He was also in the home during the time when the Children were sexually perpetrating on each other in Mother's home, but he failed to discover the issue through proper supervision. Finally, Father admitted to prior "physical altercations" with Mother in front of the Children. State's Ex. G p. 12.

Since their placement in the therapeutic foster home, the Children have made a lot of progress, both behaviorally and academically. At first, the Children were aggressive with each other and defiant of adults. They were diagnosed with a variety of cognitive

and behavioral problems. As noted before, the Children were also sexually perpetrating on each other. Moreover, they were doing poorly in school, frequently lying, stealing and hoarding food, and lacked basic hygiene.

Although the Children still have a number of behavioral issues, they have made vast improvements and are learning how to better express their anger. There has been a decrease in the Children's sexualized behaviors. The Children "are now getting good grades in school." Tr. p. 153. They are less disruptive in school and in the foster home, and they have learned appropriate hygiene. The therapists for the Children attribute these positive changes to a combination of intense therapy and the efforts of the foster parents in increasing supervision, employing consistent consequences for poor behavior, and separating the Children into separate bedrooms.

At the time of the termination hearing, Mother's father was helping her afford a four bedroom home. She claimed she was now taking her prescribed medication, which is provided by Edgewater. Although unemployed, Mother provided evidence of her enrollment in college classes. She stated she had applied for Social Security Disability benefits due to her mental illnesses, but her application was denied. She testified that she was not "resistant" to services, but she admitted to missing appointments. Id. at 294. Mother testified that she thought she could raise the Children with family support.

The executive director of the Indiana Parenting Institute where Mother had self-enrolled in services testified that Mother "understands completely what is required at this point now in order to take care of her children." Id. at 327. Regarding Mother's ability

10

to parent five children with various special needs, she stated that Mother "would be able to parent . . . with some level of supervision . . . ." Id. at 328.

Conversely, the FCM believed Mother "[would] not be able to parent the children in the reasonably near future." Tr. p. 161. Mother's DCS-referred therapist agreed and testified that she believed the Children should be "freed up for adoption." Id. at 243.

At the time of the hearing, Father was unemployed and living in a studio apartment, but he reported being able to obtain a larger residence if necessary. Though Father had reduced his alcohol consumption, he was still drinking several times a week. His therapist testified that Father is finally "getting it, that his children are important to him." Id. at 343. However, she declined to say whether Father would presently be an effective parent for his children because she had not been able to witness his interactions with them.

When the FCM was asked if Father "is in a position today to take the kids[,]" she stated, "No, he's not." Tr. p. 164. Father's home-based casework provider testified that Father "knows the basics" of parenting and that Father is "aware of some of the issues with the children." Id. at 204. However, she also stated that Father was not currently in a position to parent his children on his own. Id. at 206.

The FCM testified that it is in the Children's best interests for Mother's and Father's parental rights to be terminated so that the Children can be adopted. The therapist for V.R. and C.R.Jr. testified that it would be in their best interests to be adopted by their current foster parents. Similarly, the therapist for D.B., K.B., and A.R. testified

11

that it was in their best interests to stay in their current placements until they reached adulthood.[4]  The foster mother for K.B., A.R., V.R., and C.R.Jr. testified that she is "committed" to adopting them.  Id. at 265.

In December 2011, the juvenile court heard evidence on the termination petition over two days.  On January 10, 2012, the juvenile court granted the petition with respect to K.B., A.R., V.R., and C.R.Jr. and issued its findings of fact and conclusions of law. With respect to Mother, the juvenile court found that although Mother participated in services, she "failed to make any sustainable progress" because the same problems recurred over and over notwithstanding all of the services and assistance provided to Mother.  Father's Appellant's App. p. ii.  With respect to Father, the juvenile court found that although Father had the opportunity to secure visitation with his children by providing a negative drug screen, he failed to do so or to even maintain contact with the DCS.  The juvenile court also noted that Father admitted to being non-compliant with the DCS case plan until after the termination petition was filed, that Father "struggles with ongoing instability[,]" and that "Father's current living arrangements are not able to accommodate the children."  Id. at iii.

The juvenile court pointed out that multiple attempts at reunification had failed and that the Children, since being outside the care of their parents, had made "significant improvements in behavior management and emotional and mental development."  Id. at iv.  Consequently, the juvenile court determined that termination of the parent-child

---

[4] D.B. is no longer placed in the same foster home as the rest of the children.

relationship would be in the Children's best interests. Furthermore, the juvenile court found that adoption by the current foster parents was a satisfactory plan for the long-term care and treatment of K.B., A.R., V.R., and C.R.Jr. and that "[i]t would be unfair to the children to delay such permanency on the very remote likelihood of the parents committing to and completing services." Id. Mother and Father now appeal.

## DISCUSSION AND DECISION

Mother and Father challenge the sufficiency of the evidence supporting the termination of their parental rights. More particularly, each parent contends that the DCS failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the reasons for the Children's removal have not been remedied or that the continuation of the parent-child relationship poses a threat to the Children; (2) termination of the parent-child relationship is in the Children's best interests; and (3) the DCS has a satisfactory plan for the care and treatment of the Children.

## I. Standard of Review

The traditional right of parents to raise their children is a fundamental liberty interest protected under the Fourteenth Amendment to the United States Constitution. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Yet parental rights are not absolute and must be subordinated to a child's interest in determining the proper disposition of a petition to terminate parental rights. Id. Termination of the parent-child relationship is appropriate "when the parents are unable or unwilling to meet their parental responsibilities." Id. The purpose of a termination is

13

not to punish parents but to protect their children. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999).

When reviewing a juvenile court's decision to terminate parental rights, we neither reweigh the evidence nor judge the credibility of witnesses. Bester, 839 N.E.2d at 147. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment and will reverse only if the judgment is clearly erroneous. Id. Because the juvenile court made specific findings of fact and conclusions of law in its order terminating the parental rights of Mother and Father, we apply a two-tiered standard of review. Id. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id.

## II. Sufficiency of the Evidence

When the DCS seeks to terminate parental rights, it must plead and prove, in pertinent part, the following statutory elements:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

14

Ind. Code § 31-35-2-4(b)(2)(B)-(D). These elements must be proved by clear and convincing evidence. Bester, 839 N.E.2d at 148. We note that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and thus requires only one of the three elements under subsection (B) to be proven. Id. at 148 n.5.

## A. Conditions Remedied

Mother and Father first argue that the juvenile court erred in finding that a reasonable probability exists that the conditions that resulted in the Children's removal from the home would not be remedied. When examining this factor, the trial court must judge one's fitness to parent at the time of the termination hearing, taking into consideration evidence of changed circumstances. Bester, 839 N.E.2d at 152. The trial court must also evaluate a parent's habitual pattern of conduct to determine if future changes are likely. In re B.M., 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). Generally speaking, "[t]he time for parents to rehabilitate themselves 'is during the CHINS process, prior to the filing of the petition for termination.'" Id. (quoting Prince v. Dep't of Child Servs., 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007)) (emphasis in original).

Mother contends that the trial court erred because it "failed to take into consideration" evidence favorable to Mother or that would excuse her noncompliance, such as that Mother completed a number of services, that she had "suitable housing and sustained income" at the time of the termination hearing, that her mental illnesses negatively impacted her ability to understand the expectations of the DCS, and that her

15

medication had side effects. Mother's Appellant's Br. p. 10. As Mother's arguments are simply requests that we reweigh the evidence and consider evidence that was not in the record, both of which we may not do, Mother's arguments on this point are unavailing.

Moreover, we believe there is ample evidence in the record to support the trial court's finding as to Mother. In particular, Mother moved numerous times and was often unable to pay her utility bills, she failed to teach the Children hygiene or employ consistent discipline, she did not cooperate with the school when the Children were struggling, she failed to obtain necessary medical care for K.B. without DCS intervention, and she failed to notice that the Children were exhibiting inappropriate sexual behaviors. Tr. p. 82-83, 85-87, 89, 95-96, 122-23, 131-33, 139, 145, 191-94, 235-36, 238-39, 241, 243-45, 248, 259.

Although Mother participated in the services referred by the DCS inasmuch as she attended them, the totality of the evidence demonstrates that Mother failed to internalize what she learned. Id. at 68, 101, 123-24, 135-36. Importantly, despite more than four years of services, no provider with whom Mother worked testified that she was capable of parenting the Children without support. Id. at 68, 242, 254, 272-74, 328. In short, the Children were chronically neglected by Mother, and the DCS met its burden in showing that there was a reasonable probability that such conditions would not be remedied.

Father contends that he demonstrated that there was a reasonable probability that the reasons for removal had been remedied because he was actively participating with service providers and had shown progress in his parenting skills at the time of the

16

termination hearing. Father's Appellant's Br. p. 9-10. However, Father misreads the statute, which requires that the juvenile court grant the termination petition if it finds there is a reasonable probability that the reasons for removal or placement outside the home will not be remedied, not that the juvenile court deny the petition if there is a reasonable probability that the conditions have been remedied. I.C. § 31-35-2-4(b)(2)(B)(i).

Here, the juvenile court based its conclusion on its findings that Father failed to comply or maintain contact with the DCS until November 2011, that Father failed to provide a negative drug screen so that he could visit with his children and thus still had not visited with his children, that Father struggles with ongoing instability, and that Father's residence at the time of the hearing could not accommodate his children. Father's Appellant's App. p. iii. Indeed, although Father may have been able to see his children while they were placed with Mother, he only saw them one time during the nine months they were in foster care in 2009 and has not seen them at all since their removal in April 2010. Tr. p. 101-02. And despite needing only to provide one clean drug screen in order for visits to start, Father failed to make himself available for screening or to even maintain contact with the DCS until after the termination petition had been filed. Id. at 101-05, 172, 176. Then, after nearly a two-year absence from any interaction with the case, Father reappeared and requested services, which the DCS referred. Id. at 162-63, 172. Still, however, Father's participation was inconsistent. Id. at 163, 165, 173-74, 200.

17

Essentially, Father's history with services suggested a pattern of non-compliance that would likely continue.

Importantly, however, Father's inconsistent participation with services is not the only issue keeping the DCS from reunifying his children with him. Once Father began participating, it was discovered that when he lived with Mother and the Children, he smoked marijuana regularly and drank heavily to the point of passing out, he failed to intervene in the Children's poor hygiene, and he also failed to notice that the Children were sexually perpetrating on each other. Id. at 175, 203. Father still drinks multiple times per week. Id. at 176, 203. Moreover, Father never supported his children financially and was unemployed and living in a place unsuitable for his children to live at the time of the termination hearing. Id. at 162, 164, 172, 201-02, 347-48. Thus, in light of the evidence supporting the juvenile court's findings, we cannot say that the juvenile court erred in its determination that there was a reasonable probability that the conditions which led to Father's children's removal and placement outside his home will not been remedied.[5]

## B. Best Interests

Mother and Father next contend that the DCS failed to sufficiently prove that termination of the parent-child relationship was in the best interests of the Children. In

---

[5] Mother and Father also claim that the juvenile court erred in finding that there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. However, we need not address these claims because we already concluded that the DCS proved that the removal conditions were unlikely to be remedied, and the DCS is only required to prove one of the elements under subsection (B). See Bester, 839 N.E.2d at 148 n.5 (noting that termination may be supported by the trial court's finding of either element).

determining the best interests of a child, the juvenile court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development are permanently impaired before terminating the parent-child relationship. In re A.A.C., 682 N.E.2d 542, 545 (Ind. Ct. App. 1997).

Here, the FCM and a number of providers testified unequivocally that termination was in the Children's best interests. Tr. p. 64-65, 166, 214-15, 243. This, as well as the evidence showing Mother's sustained inability to provide for the Children's basic needs, Father's failure to comply with services even when his ability to see his children depended upon it, and the academic and behavioral improvements the Children have made since being outside the care of their parents, is sufficient evidence to support the juvenile court's determination that termination of the parent-child relationship is in the Children's best interests. Id. at 63, 82-83, 85-87, 89, 95-96, 101-05, 131-33, 166-70, 172, 176, 212, 214-15, 223-24, 243-45, 261-263.

### C. Satisfactory Plan

Finally, Mother and Father assert that the DCS has failed to prove that there is a satisfactory plan for the care and treatment of K.B., A.R., V.R., and C.R.Jr. The juvenile court found that the permanency plan of adoption by the foster parents was a satisfactory plan. Father's Appellant's App. p. iv. We must agree. The Children have shown significant progress in their current placement, and the foster mother testified that she

intends to adopt the four children placed with her if the parental rights of their parents are terminated. Tr. p. 166-70, 212, 214-15, 223-24, 261-63, 265. The evidence in the record more than supports this finding.

In conclusion, the trial court's findings of fact and conclusions thereon were supported by clear and convincing evidence. Accordingly, the juvenile court did not err in terminating the parental rights of Mother and Father.

The judgment of the juvenile court is affirmed.

ROBB, C.J., and BRADFORD, J., concur.