Arica Drake PRINCE, Appellant–
Respondent,

v.

DEPARTMENT OF CHILD
SERVICES, Appellee–
Petitioner.

No. 02A03–0606–JV–269.

Court of Appeals of Indiana.

Feb. 27, 2007.

Richard L. Williams, Fort Wayne, IN, Attorney for Appellant.

Sherry A. Hartzler, Department of Child Services, Fort Wayne, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

Arica Drake Prince appeals the termination of her parental rights to her five children. Prince claims the evidence was insufficient to support the judgment. Because Prince had remained sober only during the months she was on probation and ordered by a criminal court to stay in a drug treatment facility, she had not yet demonstrated she could remain sober without the threat of imprisonment. In light of her history of relapses, we cannot say the court erred when it found no change in the circumstances resulting in the children being removed from Prince's care. Because the evidence also demonstrated termination was in the children's best interests, we affirm.

## FACTS AND PROCEDURAL HISTORY

On March 7, 2005, the Allen County Department of Child Services ("DCS") filed petitions to terminate Prince's rights to each of her five children. The petitions were consolidated for trial. On May 19,

2006, the court entered five orders terminating Prince's rights, and each order included the following two sections: [1]

4. It is established by clear and convincing evidence that the allegations of the Petition are true in that there is a reasonable probability that the conditions that resulted in the child's removal and the reasons for the placement outside the parents' home will not be remedied, and/or that continuation of the parent/child relationship poses a threat to the well-being of the child.

Evidence presented at the hearing on the Petition for Termination of the Parent/Child Relationship revealed that the mother has had extensive involvement with the Department of Child Services dating back to 1999. When the mother became involved with the Department of Child Services in 1999, she admitted to having a history of drug and alcohol abuse and the mother admitted to leaving her children, then ages one through six, unattended at her residence. Additionally, the mother admitted to having a history of involvement with Child Protective Services in Lake and Allen Counties. Evidence presented at the Termination Hearing revealed that wardship of the Respondent/Mother's children was terminated in August of 2000, after the mother complied with services.

Evidence presented at the Termination Hearing revealed that the reasons for removal of the children from the mother's home in December of 2003 when the most recent CHINS involvement began are substantially the same as those that were present when the mother's first involvement with the Allen County Department of Child Services began in 1999, despite the mother's receipt of services in 1999 and the closure of the case in 2000, as a result of mother's completion of services.

With the mother's most recent involvement with the Department of Child Services, an Initial Hearing was held on January 27, 2004, and the mother admitted to leaving her children on December 19, 2003, and not returning to provide care for the children until December 21, 2003. Additionally at the Termination Hearing, the mother admitted to using crack cocaine and to consuming alcoholic beverages while away from home. Further, the mother admitted that she had a drug and alcohol problem. Finally, the mother admitted that she failed to fully benefit from services provided to her.

Although evidence presented at the Termination Hearing revealed at the time of the Termination Hearing, the mother had maintained sobriety for a period of time and that the mother had participated in substance abuse treatment and had a home to reside in, the Court finds that the Department of Child Services has proven that the mother has established a habitual pattern of an inability to maintain sobriety, and inability to provide her children with a safe and stable home environment and an inability to benefit from services provided to her.

Evidence presented at the hearing on the Petition for Termination of Parent/Child Relationship revealed that at the time of the initiation of the CHINS proceedings in the underlying CHINS cause, the alleged father ... and the unknown father had not visited the child or paid support or provided for the basic necessities, of a suitable home for the raising of said child. Evidence present-

1. The only differences between these sections across the five orders were the inclusion, at the places marked by ellipses in this rendition, of the name of the child at issue and the name of the alleged father of that child.

ed at the hearing on the Petition for Termination of the Parent/Child Relationship further revealed that at the time of the Termination Hearing, no individual claiming to be the father of the child had contacted the Department of Child Services casemanager inquiring about the child or had visited the child, provided material or financial support for the child or otherwise provided for the basic necessities of a suitable home for the raising of said child. Accordingly, the Magistrate finds that the alleged father ... and the unknown fathers' [sic] lack of involvement in the child's life and failure to provide materially or financially for the child's well being which existed at the time of the initiation of the CHINS proceedings in the underlying CHINS cause continued to exist at the time of the Termination Hearing.

Accordingly, the Magistrate finds that the Department of Child Services have [sic] proven by clear and convincing evidence that the allegations of the Petition are true in that there is a reasonable probability that the conditions that resulted in the child's removal and the reasons for the placement outside the parents' home will not be remedied and/or that continuation of the parent/child relationship poses a threat to the well being of the child.

5. Termination of the parental rights is in the best interest of the child ... in that the mother, alleged father ..., and the unknown father have shown over the course of the related CHINS cause, and in the fact of a treatment plan or plans, and numerous specific services made available and/or provided, that said parents continue to be unable, refuse, or neglect to provide for the basic necessities of a suitable home for the raising of said child.

Evidence presented at the Termination Hearing revealed that the mother has established a habitual pattern of an inability to maintain sobriety and to benefit from services. At the Termination Hearing, the mother testified that she began using drugs and/or alcohol when she was twelve years old. Evidence presented at trial revealed that the mother has had involvement with the Department of Child Services in Lake and Allen Counties. Further, evidence presented at the Termination Hearing revealed that the mother's initial involvement with the Allen County Department of Child Services began in 1999. Allegations that were admitted by the mother at the Initial Hearing included the fact that the mother had a history of drug and alcohol abuse and that she left her children, then ages one through six, unattended at her residence. Additionally, the mother admitted to having a history of involvement with Child Protective Services in Lake and Allen Counties.

The CHINS proceedings that were initiated in 1999, ended in 2000, when the case was closed as a result of the mother's completion of services. Despite the completion of services and the closure of the CHINS case in 2000, the family was brought back to the Court's attention in December of 2003. Evidence presented at the termination hearing revealed that the reasons for removal of the children from the mother's home in December of 2003, when the most recent CHINS involvement began are substantially the same as those present when the mother's first involvement with the Allen County Department of Child Services began in 1999. An Initial Hearing was held on January 27, 2004, and the mother admitted to leaving her children on December 19, 2003, and not returning to provide care for

her children until December 21, 2003. Additionally, the mother admitted to using crack cocaine and to consuming alcoholic beverages while away from home. Further, the mother admitted that she had a drug and alcohol problem and that she failed to fully benefit from services provided to her.

A Dispositional Hearing was held on January 27, 2004, and the mother was placed under a Parent Participation Plan. As part of the Parent Participation Plan, the mother was ordered to refrain from criminal activity. Evidence presented at trial revealed that the mother failed to comply with this element of the Parental Participation Plan. Evidence presented at the termination hearing revealed that on July 6, 2004, the mother was convicted of Possession of Marijuana and was placed on probation. The Court notes that the mother was already on probation at the time of the conviction for Possession of Marijuana as a result of a conviction for Operating While Intoxicated which conviction arose around the time that the CHINS proceedings began in December of 2003. On April 15, 2005, the mother admitted to violating the terms of her probation and on April 29, 2005, the criminal court extended her probation for one year beyond the original one-year probation period. Additionally, the mother was ordered to seek treatment at the Hope House. Further, evidence presented at the termination hearing revealed that the mother failed to appear for a hearing in the criminal court and she was jailed from March 24, 2005 through March 28, 2005, as a result of the issuance of a warrant which was issued because the mother failed to appear for a hearing.

Additionally, in the Parent Participation Plan, the mother was ordered to refrain from consumption of drugs and alcohol and to submit to random urinalysis testing. The Department of Child Services made a referral to Lutheran Social Services for the mother's participation in services. Evidence presented at trial revealed that the mother worked with Lutheran Social Services from April of 2004 until November of 2004. At trial, the Lutheran Social Services casemanager testified that the Respondent/mother missed approximately eleven (11) random visits during that timeframe and that she missed scheduled visits as well. Additionally, the Lutheran Social Services casemanager testified that the mother had three positive screens for cocaine and six positive screens for benzodiazapeme [sic] and that the mother had four positive no shows during the time that the mother's case with Lutheran Social Services was open. The Lutheran Social Services casemanager testified that the mother tested positive for cocaine in June of 2004 as well as August of 2004. Further, evidence presented at trial revealed that the mother submitted to a hair follicle test on August 13, 2004, which revealed recent cocaine use and the use of barbiturates and benzodiazapeme [sic]. Evidence presented at trial revealed that the mother was not tested by Lutheran Social Services or by the Department of Child Services from January of 2005 until her entrance into the Hope House in May of 2005. Evidence presented at trial revealed that while at the Hope House, from May of 2005 until January of 2006, the mother did not test positive for the use of illegal substances.

In the Parent Participation Plan, the mother was ordered to submit to a Drug and Alcohol Assessment and to follow all recommendations. Evidence presented at trial revealed that the mother completed the Drug and Alcohol Assessment

and that one of the recommendations from the assessment was that the mother participate in drug and alcohol counseling. A referral was made for the mother's participation in Drug and Alcohol counseling through Park Center. Evidence presented at trial revealed that the mother began participation in drug and alcohol counseling at Park Center in March of 2004, and that she stopped participating in counseling in January of 2005. Testimony presented at trial revealed that the mother's case at Park Center was closed in February of 2005, as a result of the mother's non-compliance with services. Evidence presented at trial revealed that the mother began participation with the Hope House in May of 2005 as a result of the orders of the Court in the criminal proceedings and that she resumed participation in substance abuse counseling in May of 2005 and completed said counseling in December of 2005.

Further, in the Parent Participation Plan, the mother was ordered to participate in visitation with her children at SCAN. Evidence presented at the termination hearing revealed that the mother regularly visited with her children at SCAN. The SCAN casemanager testified that supervised visits began in May of 2004. The casemanager testified that beginning in March of 2005 and for a period of approximately six weeks thereafter, the mother appeared depressed during visits, that she did not take an active role in parenting and that she would lay on the couch and the children would have to go over to the couch in order to interact with the mother. Additionally, on a few occasions, the mother had difficulty interacting with her son, [L.D.] and on one occasion during a visit that occurred in November of 2005, the mother told the SCAN casemanager that she was writing off all ties with her son, [L.D.], and the mother indicated that she did not want to have visits with [L.D.]. The SCAN casemanager testified that visitations with [L.D.] were abated for a period of approximately two months.

Evidence presented at trial revealed that the mother's current husband, Kenneth Prince, also has involvement with the Department of Child Services as it relates to his daughter. Evidence revealed that Kenneth Prince's daughter has been removed from his care and placed in relative care, that Kenneth Prince has a substance abuse problem and that he is non-compliant with services ordered under his Parent Participation Plan.

The mother's compliance with the terms of the Parent Participation Plan began in May of 2005, approximately two months before the termination proceedings began and the compliance continued for an approximate period of nine months. Said period of compliance does not outweigh the mother's long and habitual pattern of substance abuse, her history of engaging in criminal activity, her history of involvement with the Department of Child Services in both Lake and Allen Counties, her history of relapses, as well as a demonstrated inability to benefit from services on a sustained basis. Accordingly, the Magistrate finds that the Department of Child Services has proven by clear and convincing evidence that termination of the parent/child relationship is in the child's best interests.

(Appellant's App. at 2–6, 9–13, 16–20, 23–27, 30–34.)

## DISCUSSION AND DECISION

When a parent appeals the termination of her parental rights, we will not reverse the trial court's judgment unless it

is clearly erroneous. *M.H.C. v. Hill,* 750 N.E.2d 872, 875 (Ind.Ct.App.2001). When determining whether the evidence supports the findings and judgment, we may not reweigh the evidence or reassess the credibility of the witnesses. *Id.* We will set aside the trial court's findings only if they are clearly erroneous; that is, if the record lacks any evidence or reasonable inferences to support them. *Id.* We consider only the evidence and reasonable inferences therefrom that support the judgment. *In re D. G.,* 702 N.E.2d 777, 780 (Ind.Ct.App.1998).

■ The Fourteenth Amendment to the United States Constitution gives parents a right to establish a home and raise their children. *Id.* However, a parent's right to her children is balanced against the State's limited authority to interfere for the protection of the children. *Id.* Consequently, a trial court may not terminate a parent's rights unless the State demonstrates by clear and convincing evidence "there is a reasonable probability that: (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child." [2] Ind.Code § 31–35–2–4(b); *see also In re W.B.,* 772 N.E.2d 522, 529 (Ind.Ct.App.2002) (noting State's burden of proof).

■ To determine whether there is a reasonable probability the conditions justifying a child's continued placement outside the home will not be remedied, "the trial court must judge a parent's fitness to care

for her children at the time of the termination and take into consideration evidence of changed conditions." *In re J.T.,* 742 N.E.2d 509, 512 (Ind.Ct.App.2001), *trans. denied sub nom. Timm v. Office of Family & Children,* 753 N.E.2d 12 (Ind.2001). Nevertheless, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* The court may consider the parent's response to services offered by an Office of Family and Children when determining whether conditions have changed. *See M.B. v. Delaware County Dept. of Welfare,* 570 N.E.2d 78, 82 (Ind.Ct.App.1991).

■ Prince does not challenge the trial court's findings. Rather, she asserts the court's finding that she had been sober for nine months should have compelled the court to conclude the circumstances resulting in the children's removal had changed. She argues:

The trial court's rationale in a nutshell is that a full compliance with a Parent Participation Plan for a period of nine months does not outweigh a history of prior bad conduct. This rationale has both negative practical and legal ramifications under the current CHINS statutory scheme.

The practical ramification will be that parents will no longer have an incentive to comply with the Parent Participation Plan if a Permanency Plan provides for termination of parental rights, since the trial court in the termination proceeding can simply find that the parent's history

---

**2.** Because the statute was written in the alternative, the State needs to prove only one of these bases, and we need to find only that the evidence supports one of them. *See In re J.W.,* 779 N.E.2d 954, 962 (Ind.Ct.App.2002) (because Ind.Code § 31–35–2–4(b)(2)(B) is written in the alternative, we need not ad-

dress evidence supporting trial court's finding threat to child because evidence supported court finding reasons for removal would not be remedied), *trans. denied sub nom. Weldishofer v. Dearborn County Div. of Family & Children,* 792 N.E.2d 40 (Ind.2003).

of noncompliance outweighs any subsequent compliance.

\* \* \* \* \* \*

Although unintentional, the trial court's decision threatens to undermine the rehabilitative focus and efforts for family preservation or reunification under the CHINS statutory scheme.

(Appellant's Br. at 11–12.) We disagree with Prince both legally and factually.

The trial court's decision does not undermine the rehabilitative focus under the CHINS statutory scheme; rather, it reinforces that the time for parents to rehabilitate themselves is during the CHINS process, *prior* to the filing of the petition for termination. The termination statutes do not require the court to give a parent additional time to meet his or her obligations under the Parent Participation Plan. *See, e.g.,* Ind.Code § 31–35–2–6 (a hearing requested on a petition to terminate rights following a CHINS determination must be commenced within 90 days and completed within 180 days). If its schedule permitted, a court could hold a hearing and terminate a parent's rights within two weeks of the petition being filed. *See* Ind.Code § 31–35–2–6.5 (requiring interested parties be given ten days notice of a termination hearing). Accordingly, contrary to Prince's suggestion, the court's decision has no untoward impact on the CHINS statutory scheme.

Nor do we agree with Prince's assertion that a practical ramification of the court's decision will be to discourage parents from complying with the Parental Participation Plan after a petition to terminate had been filed. There are fact patterns under which we might find reversible error in a court's

failure to conclude nine months of compliance with a Participation Plan demonstrated a change in circumstances. Prince's is not such a fact pattern.

The State took custody of Prince's children in 1999 because she left them home alone while she went out to drink alcohol and use drugs. She complied with services and the State returned her children to her in 2000. She did not maintain her sobriety. In December of 2003, she again left her five children at home alone for somewhere between 24 and 48 hours while she went out to drink alcohol and use cocaine, and the State again took custody of her children. The CHINS court ordered her to receive treatment for her drug and alcohol problem, and when Prince failed to do so for over one year, the State requested termination of her parental rights.

Two months after the termination petition was filed, Prince began receiving treatment at Hope House. However, Prince's motivation to seek treatment was not to clean up her act to get her children back.[3] Rather, she went to Hope House because a criminal court ordered her there as a condition of her continued probation and under the threat that her failure to comply would result in imprisonment. Prince remained sober for eight months while in that treatment facility, and after leaving the facility on January 6, 2006, she had one negative drug screen at the beginning of February 2006. The final hearing regarding the termination petition was February 22, 2006. There, Prince testified she would continue random drug screens during the remaining six months of her probation.

Prince has not demonstrated she will remain sober without the constant threat

---

**3.** Prince's failures to begin treatment prior to the filing of the termination petition and without threat of imprisonment by the criminal court are two of the facts that make her situation different from one in which we might find nine months of sobriety a "change in circumstances" making termination improper.

of imprisonment. In light of her past failure to maintain sobriety and her admission that she failed to fully take advantage of the services offered her, we cannot say the court erred when it concluded the circumstances resulting in the children's removal had not changed. As explained above, had Prince begun treatment of her own accord or stopped abusing drugs and alcohol earlier in the CHINS process, there might have been adequate time for her to demonstrate the changes were not simply temporary and our decision might be different. However, neither trial courts nor we are required to ignore "the parent's habitual patterns of conduct [when determining] the probability of future neglect or deprivation of the child." *In re J.T.*, 742 N.E.2d at 512.

As a final matter regarding Prince's treatment for drug abuse, we must take issue with a paragraph in Prince's appellate brief:

> Unfortunately, treatment at Hope House had not been a requirement of the original Parent Participation Plan submitted by the DCS at the dispositional hearing. Nor had DCS sought to amend the Parent Participation Plan to add this requirement even though the DCS knew that drug and alcohol counseling at Park Center was not working, since [Prince] had continued to test positive for cocaine and barbiturates.

(Appellant's Br. at 10.) We reject counsel's suggestion the responsibility for his client's failure to achieve and maintain sobriety in a timely fashion belonged to either the trial court or the DCS. From one parent to the next, the DCS and trial court have no way to know whether addictions treatment is failing because the treatment is not the most appropriate for the parent or because the parent simply does not care enough about reunification to maintain sobriety under any form of treatment. Accordingly, we will not place a burden on either the DCS or the trial court to monitor treatment and to continually modify the requirements for drug and alcohol treatment until a parent achieves sobriety. Rather, the responsibility to make positive changes will stay where it must, on the parent. If the parent feels the services ordered by the court are inadequate to facilitate the changes required for reunification, then the onus is on the parent to request additional assistance from the court or DCS.[4]

 The court also found termination was in the children's best interests. Prince notes the court used the same facts to support this conclusion and argues it is wrong for the same reasons. We disagree with Prince. In light of her six-year history of involvement with DCS and her failure to demonstrate she would remain sober if not under compulsion from the criminal court, we cannot say the court erred when it concluded termination was in the children's best interests. *See In re Campbell*, 534 N.E.2d 273, 275 (Ind.Ct. App.1989) ("Two years without improvement is long enough."); *In re M.B.*, 666 N.E.2d 73, 79 (Ind.Ct.App.1996) (courts are not required to "wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship"), *trans. denied.* We therefore affirm.

Affirmed.

NAJAM, J., and MATHIAS, J., concur.

---

4. Nor is it apparent why a parent could not make such requests well before the State petitions to terminate parental rights.