**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Nov 26 2014, 10:13 am

**CLERK**
of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANT:

**NANCY A. McCASLIN**
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEY FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**CHRISTINA D. PACE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
                                  )      No. 20A03-1402-JT-72
A.B. (Minor Child) )

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
The Honorable Deborah A. Domine, Magistrate
Cause No. 20C01-1310-JT-17

**November 26, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellants-Respondents, A.M.B. (Father) and H.L.B. (Mother) (collectively, Parents), appeal the trial court's Order terminating their parental rights to their minor child, A.B. (Child).

We affirm.

ISSUE

Parents raise one issue on appeal, which we restate as follows: Whether the Indiana Department of Child Services (DCS) presented sufficient evidence to support the trial court's termination of Parents' parental rights.

FACTS AND PROCEDURAL HISTORY

Father and Mother are the parents of the Child, born on March 12, 2004.[1]

On October 16, 2007, DCS took the then-three-year-old Child into protective custody after both Parents tested positive in a drug screen for methamphetamine and amphetamines. On October 25, 2007, based on concerns about drug usage in the home and an incident of domestic violence between Parents, the trial court adjudicated the Child to be a Child in Need of Services (CHINS). The Child remained in foster care while Parents, at DCS' direction, participated in addictions assessments, random drug tests, psychological evaluations, and therapy. Parents successfully completed their case plans, and in August

---

[1] Mother has two other children from a previous relationship, a daughter, D.F., born in 1997, as well as an adult son, B.F. Although the termination proceedings and this appeal pertain solely to the Child, DCS has previously instituted protective proceedings on behalf of D.F. and B.F. involving both Parents.

of 2008, the Child was reunited with her Parents. On October 7, 2008, DCS closed the CHINS case.

Four years later, on September 27, 2012, the DCS office in Elkhart County received a report of neglect, endangerment, and exposure to illegal drug manufacturing concerning the Child. In particular, the report alleged that after their house burned down, which authorities suspected was the result of manufacturing methamphetamine, Parents and the Child moved in with friends, who also lived in a reputed "meth house" in Goshen, Indiana. (Appellants' App. p. 76). The reporting source further averred that Parents had disregarded the Child's hygiene and educational needs. On October 4, 2012, DCS made contact with Father and notified him of the ongoing investigation. Father informed DCS that Mother and the Child had relocated to Georgia to live with the Child's paternal grandmother (Grandmother). At this time, Father gave his consent for DCS to interview the Child and to obtain her records, but he refused to submit to a drug test. Later that day, DCS learned that Grandmother had not seen Father, Mother, or the Child for two years. In a subsequent effort to question Father about his deception, DCS realized that Father had provided invalid contact information. For the next several weeks, DCS unsuccessfully attempted to locate Father, Mother, and the Child.

On October 16, 2012, after discovering that the Child was enrolled at an elementary school in Goshen, DCS pulled the Child out of her second grade classroom and took her to the Child Advocacy Center for a forensic interview. DCS notified Mother of their location, and when Mother arrived, she consented to a drug screen for both her and the Child. The Child's drug screen was negative, but Mother tested positive for methamphetamine and

3

amphetamines. In addition, DCS procured the Child's school records, which indicated that the Child had transferred schools on four separate occasions since beginning kindergarten; that she had to repeat her first-grade year; and that she was placed in a special needs class for her below-grade-level reading skills. The Child's attendance record revealed eighteen and one-half absences and ten tardies in kindergarten, thirty-six absences and twenty tardies in her first year of first grade, twenty-eight absences and ten tardies in her second year of first grade, and a three-week gap at the beginning of her second-grade year during which the Child was not enrolled in any school. In light of Parents' prior history with DCS and their attempts to evade detection, along with concern about the Child's exposure to methamphetamine and her academic deficiencies, on October 24, 2012, DCS took the Child into emergency protective custody. At Parents' request, DCS placed the Child with a classmate's family.

On October 25, 2012, DCS filed a petition alleging the Child to be a CHINS. On November 1, 2012, Parents admitted that the Child was in need of services based on the allegations of their drug use and the Child's irregular school attendance, and they agreed to cooperate with DCS. Following Parents' qualified admission, the trial court adjudicated the Child to be a CHINS. On November 29, 2012, the trial court issued a Dispositional Order, which required Parents, in part, to notify DCS of any changes in employment or contact information; enroll in any program "recommended by [DCS] or other service provider and ordered by the courts" within thirty days of the referral and to participate in each "program without delay or missed appointments"; abstain from consuming, manufacturing, or exchanging any illegal controlled substances; complete a substance

4

abuse assessment and follow treatment recommendations; submit to random drug and alcohol screens within twenty-four hours of request; attend supervised visits with the Child; and pay weekly child support. (Appellants' App. p. 124).

On December 18, 2012, DCS referred Parents to a counseling center, where a licensed clinical social worker (LCSW) completed their substance abuse assessments. Following her interview with Father, the LCSW recommended that he "be placed as quickly as possible in an inpatient setting for drug and alcohol treatment." (Exh. D, p. 4). As for Mother, the LCSW recommended therapeutic treatment to resolve the underlying issues that trigger her substance abuse. On January 23, 2013, DCS referred both Parents to its contracted provider for out-patient therapy services.

On February 4, 2013, DCS filed a motion to modify the Child's placement. At a modification hearing on February 14, 2013, the DCS case manager testified that the Child requested the change because there was too much competition involved in living with a classmate. Former neighbors and friends of the family, B.S. and R.S. (Foster Parents), welcomed DCS' request to take custody of the Child, and Parents agreed that placement with Foster Parents would best serve the Child's interests. The trial court accordingly granted DCS' motion to place the Child with Foster Parents. Following her change of placement, the Child began to thrive both academically and emotionally. Foster Parents reported an improvement in the Child's grades and that she is now performing at grade-level, as well as that the Child has integrated into their family and "knows [that] she's loved and nurtured." (Transcript p. 130). Foster Parents are willing to adopt the Child.

During the course of the proceedings, Parents made no progress in their plans to be reunited with the Child. As of March 2013, Parents had attended just two sessions with their therapist. Besides their missed therapy appointments, Parents failed to obtain and maintain employment, and consequently did not pay any child support, and their sporadic attendance at supervised visits began having a detrimental impact on the Child's emotional well-being. Parents consistently failed their drug screens, testing positive on seven (Father)/eight (Mother) occasions for various combinations of amphetamines, methamphetamine, THC, opiates, oxycodone, and cocaine. Furthermore, Parents repeatedly moved and changed their telephone numbers without updating DCS, which inhibited the ability of DCS and other service providers to make appointments and to monitor Parents' progress. From mid-April of 2013 through the end of May 2013, Father was unable to participate in his DCS case plan because he was incarcerated on an outstanding warrant. On May 15, 2013, DCS filed a Verified Information for Rule to Show Cause. At a hearing on June 18, 2013, the trial court, finding that Parents had not "fully followed through with services" or regularly visited the Child, held them in contempt of court. (Tr. p. 120).

Despite the contempt finding, Parents did not demonstrate any renewed effort to regularly attend counseling or to secure steady employment or housing, so on August 19, 2013, DCS informed Parents of its intent to change the permanency plan from reunification to adoption. Upon this notification, Parents reported having suicidal thoughts and checked themselves into a hospital. Also, Father called the DCS office and made threats, which

6

resulted in the issuance of a protective order that prohibited Father from having any contact with the DCS case manager unless it related to the case.

On October 2, 2013, DCS filed a Petition for the Involuntary Termination of the Parent-Child Relationship. Thereafter, Parents began attending their supervised visits on a consistent basis, and each passed one drug screen. In January of 2014—approximately two weeks prior to the scheduled termination hearing, Parents notified DCS that they had been accepted into a substance abuse program at Hope Ministries in South Bend, which provided housing so long as Parents abided by the program. On January 24, 2014, the trial court conducted an evidentiary hearing on DCS' Petition. On January 30, 2014, the trial court issued its Order terminating Parents' rights.

Parents now appeal. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Standard of Review*

In reviewing the termination of a parent's rights, it is a long-settled tenet of this court that the trial court is entitled to considerable deference. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). Our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). Rather, we will consider only the evidence, and any inferences reasonably derived therefrom, most favorable to the trial court's judgment. *Id.* Here, the trial court supported its decision with findings of fact and conclusions thereon; thus, pursuant to Indiana Trial Rule 52(A), our court will "not set aside the findings or judgment unless clearly erroneous." In addition, Indiana Code section 31-37-14-2 requires that a finding in a termination proceeding "be based upon clear and

7

convincing evidence." Accordingly, in reviewing whether the trial court's findings or judgment are clearly erroneous, we must determine "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010).

## II. *Termination of Parental Rights*

The traditional right of parents to direct the care, custody, and control of their "children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d at 1259 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The Fourteenth Amendment to the United States Constitution prevents the State from unduly interfering with parents' decisions regarding the upbringing of their children. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 93 (Ind. Ct. App. 2014). However, parental rights are not absolute; in fact, they are "subordinate[] to the children's interests when the children's emotional and physical development is threatened." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*.

A court may terminate parental rights "when parties are unable or unwilling to meet their responsibility as parents." *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. Because the termination of parental rights permanently severs the parent-child relationship, it is an extreme sanction that "is intended as a last resort, available only when all other reasonable efforts have failed." *C.A.*, 15 N.E.3d at 92. The purpose of termination is to protect the children, not to punish the parents. *Lang*, 861 N.E.2d at 371. In such cases, Indiana law stipulates that DCS must establish, in part,

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

\* \* \* \*

(B) that one (1) of the following is true:
    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
    (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each statutory element by clear and convincing evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014).

On appeal, Parents challenge the sufficiency of the evidence supporting the trial court's conclusion that there is *either* a reasonable probability that the conditions necessitating the Child's removal will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Child's well-being, as well as that termination is in the Child's best interests.

A. *Reasonable Probability That Conditions Will Not Be Remedied*

Parents contend that DCS did not present sufficient evidence that the conditions resulting in the Child's removal and continued placement outside of their care will not be remedied. In evaluating whether DCS has sufficiently established this element for termination, the trial court should "judge a parent's fitness to care for [his or] her children at the time of the termination and take into consideration evidence of changed conditions." *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1229 (Ind. Ct. App. 2007). Evidence

9

concerning "the parent's habitual patterns of conduct" is indicative of "the probability of future detrimental behavior." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). To this end, the trial court may consider facts of "a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also reasonably take into account the services offered by DCS and the parent's response thereto. *In re B.D.J.*, 728 N.E.2d at 201.

In this case, the Child was removed from Parents' custody due to "unstable housing, allegations of drug use and drug manufacturing by the [P]arents, and [P]arents' neglect of [the Child's] hygiene and her education. At the time the [C]hild was removed, the [P]arents were homeless, unemployed, and using drugs." (Appellants' App. p. 25). At the time DCS filed its Petition, the Child had been removed from Parents' care for a year, but Parents had not taken any measures to remedy any of these issues. As the trial court found, in relevant part,

> At the time of the termination hearing[,] the [P]arents had produced only one negative drug screen, but they testified that they were clean. . . . [P]arents, however, had yet to finish a drug treatment program, they were unemployed, and except for a temporary apartment at [Hope Ministries], they were still without a permanent home.
>
> * * * *
>
> Therapists . . . all tried to work with [Parents], and all described[] that [P]arents failed to show up and as a consequence all three therapists assessed the prognosis of the [P]arents for sobriety as poor.
>
> * * * *

10

Here, the habitual patterns of conduct of [Parents] are actions that demonstrate a long history of serious drug use and addiction. . . . [The Child] was removed from her [P]arents on October 16, 2007, because of [their] drug use, the [P]arents sobered and [the Child] returned to their care six months later. But [the Child] was removed again on October 24, 2012, because of [their] drug use. . . . [Parents'] sobriety, if in fact true, is recent and motivated by the filing of the Petition . . . . Their sobriety, if true, is admirable but it is not enough to overcome a long history of drug use and relapse. . . .

* * * *

[P]arents never asked for help and they simply did not make the positive changes necessary to support a conclusion that the circumstances that resulted in the removal of [the Child] changed enough, it at all, to believe that it is a permanent change. Under the circumstances of this case, the [c]ourt finds very little change, and surely not enough [change] and surely not long enough . . . to suggest there has been a remedy for the reason that [the Child] was removed.

(Appellants' App. pp. 25-29).

Parents do not specifically challenge any of the trial court's findings as being unsupported by the evidence. Instead, they argue that the trial court's determination is based on insufficient evidence because "DCS failed to provide the access to help [that] [they] needed"—namely, "in-patient drug and addictions treatment for Father and . . . the type of counseling that [the LCSW] indicated Mother needed." (Appellants' Br. pp. 18-19). Without access to services that would have enabled them to remedy the conditions that led to the Child's removal, Parents posit that DCS thwarted their "chance to be successfully reunited with their [C]hild." (Appellants' Br. p. 19). We disagree.

Following the removal of a child from his or her parents, DCS must undertake reasonable efforts "to make it possible for the child to return safely to the child's home as soon as possible." *Lang*, 861 N.E.2d at 377. Thus, DCS routinely implements parental participation plans and offers various services designed to assist parents with regaining

11

custody of their children. *In re B.D.J.*, 728 N.E.2d at 201. However, "the law concerning termination of parental rights does not *require* [DCS] to offer services to the parent to correct the deficiencies in childcare." *Id.* (emphasis added). Instead, it is the responsibility of the parent—and the parent alone—to make the changes necessary to remedy the conditions that warranted DCS' intervention. *Prince*, 861 N.E.2d at 1231. In fact, even if DCS offers no services, a trial court may still terminate parental rights so long as DCS proves the statutory elements by clear and convincing evidence. *Id.*

In the present case, DCS endeavored to engage Parents in various services—including substance abuse assessments and therapy, random drug tests, and a referral to a consultant to assist Parents with securing employment and housing. Parents, however, neither availed themselves of these resources nor undertook to independently remedy their problems. Although the LCSW recommended that Father be placed "in an inpatient setting for drug and alcohol treatment[,]" the DCS case manager testified that DCS does not have a contracted provider for in-patient substance abuse treatment, and it is not a service that DCS is able to provide. (Exh. D., p. 4). DCS and Father discussed his option to independently pursue in-patient treatment, and, as an alternative, DCS offered to provide out-patient therapy. It is unclear whether Father sought admission into an in-patient program, although he testified that "there's three months waiting list at any in-patient." (Tr. p. 362). It is undisputed, though, that Father attended no more than six out-patient therapy sessions as he saw no "point in going" because it did nothing to help decrease his desire to use drugs. (Tr. p. 360). Similarly, following the LCSW's recommendation "that [Mother] be given the opportunity to immediately engage in therapeutic treatment[,]" DCS

12

referred her for out-patient counseling. (Exh. E., p. 4). Like Father, Mother attended only six sessions over the course of five months; plus, she arrived under the influence for at least one session and entirely disregarded her therapist's instructions to supplement their sessions by finding a sponsor and attending at least three weekly meetings with Alcoholics Anonymous or Narcotics Anonymous.

Because Parents refused to attend their therapy sessions with any regularity, DCS had no basis for discerning whether their recurring failed drug screens were the product of an unsuitable treatment regimen or "because [Parents] simply [did] not care enough about reunification to maintain sobriety under any form of treatment." *Prince*, 861 N.E.2d at 1231. The burden is not on DCS or the trial court to continually monitor and modify a parent's treatment until the parent finally achieves sobriety. *Id.* If a parent believes that "the services ordered by the court are inadequate to facilitate the changes required for reunification, then the onus is on the parent to request additional assistance from the court or DCS." *Id.* Here, Father never requested a different therapist or a more intensive treatment program, and when the court inquired about Parents' progress during pre-Petition hearings, Father never complained about the sufficiency of his services. On the other hand, despite Mother's lack of participation in her own program, when she expressed her dissatisfaction with her therapist to the court in September of 2013, DCS immediately arranged for Mother to return to the LCSW for therapy, as Mother requested. However, after only two appointments, which Father also attended, Parents rejected the LCSW's offer for individual counseling sessions and failed to appear for any more appointments. Thus, rather than exerting *any* effort to combat their substance abuse with the assistance of

13

DCS' services or other resources, Parents opted to "sit idly by"; as a result, they may not now "successfully argue that [they] [were] denied services to assist [them] with [their] parenting." *In re B.D.J.*, 728 N.E.2d at 201.

Moreover, DCS did not pursue termination of Parents' rights because they failed to comply with the LCSW's specific therapy recommendations; rather, DCS sought termination because of their utter refusal to make any efforts toward achieving sobriety or stability in their employment and housing. Our courts have previously found that a parent who refuses to attend DCS appointments and classes demonstrates ambivalence and "an unwillingness to change existing conditions." *Id.* Additionally, it was only after DCS filed the Petition—at which point Parents had been recalcitrant in their case plans for more than a year—that Parents demonstrated any iota of effort toward reunification. We find that Parents' eleventh-hour enrollment in Hope Ministries was too little too late, and we further agree with the trial court that Parents' relapse history creates doubt as to whether they will achieve long-lasting success. Therefore, we find that clear and convincing evidence supports the trial court's determination of a reasonable probability that the conditions necessitating the Child's removal will not be remedied.[2]

## B. *Child's Best Interests*

Next, Parents contend that the evidence does not support the trial court's conclusion that termination of their parental rights is in the Child's best interests. Again, Parents'

---

[2] Because we do not find the trial court's conclusion to be clearly erroneous, we need not address Parents' alternative argument that the trial court erred in concluding that the continuation of the parent-child relationship poses a threat to the Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i)-(ii).

argument is premised solely on DCS' failure to place Father "in in-patient drug and addictions treatment and to provide Mother with therapeutic counseling to address issues resulting in her drug use." (Appellants' Br. p. 21). Parents assert that the trial court's best interests determination is clearly erroneous because "the [C]hild should not be a victim of DCS action that is contrary to the court['s] orders." (Appellants' Br. p. 21). Notwithstanding the fact that Parents elected not to support their position with cogent reasoning or citations to authority, we will address the issue rather than dismissing it as waived. *See* Ind. Appellate Rule 46(A)(8)(a).

An evaluation of a child's best interests "should not be based merely on the factors identified by . . . DCS, but instead should be based on the totality of the circumstances." *Lang*, 861 N.E.2d at 373. "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. In making this determination, the trial court is not required to "wait until a child is irreversibly harmed such that his or her physical, mental, and social development are permanently impaired." *In re A.D.W.*, 907 N.E.2d 533, 540 (Ind. Ct. App. 2008).

As already discussed in detail, the onus was on Parents, not DCS, to either obtain or request the services necessary to be able to adequately care for the Child, and the evidence clearly reveals that Parents made no progress in being able to provide a stable environment for the Child. The trial court acknowledged that Parents and the Child have a very loving relationship, noting the testimony of the visitation supervisors that Parents always

15

interacted positively and appropriately with the Child. Nevertheless, the trial court relied, in part, on the opinions of the DCS case manager, the Child's therapist, and the Child's court appointed special advocate (CASA), who all recommended terminating Parents' rights. *See In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (noting that opinions of the CASA and DCS case manager may support determination of child's best interests), *trans. denied*. Specifically, the DCS case manager testified that whereas Parents failed to make any substantial progress at any point during DCS' involvement, the Child has thrived in her current placement and is bonded with Foster Parents and her two foster siblings. The Child's therapist testified that the Child "needs somebody that can be stable and safe and dependable[,]" but in her relationship with Parents, Child puts herself at risk in order to protect and please them. (Tr. p. 202). The therapist also opined that the continuation of the Child's co-dependent relationship with Parents would prevent her from ever having a "healthy, . . . mutually respectful relationship as an adult." (Tr. p. 199). Similarly, the Child's CASA testified that Parents' inconsistency has caused anxiety in the Child and even some behavioral problems, but with Foster Parents, the Child is finally "in a stable home. She is loved, she has been taken care of." (Tr. p. 332).

Furthermore, we find that the record is replete with additional support for the trial court's determination. Parents have established a pattern of putting their own needs ahead of their Child's needs, including the fact that they missed nineteen visits with the Child. In the midst of these proceedings, Grandmother gifted Parents with a sum of money to use as a down payment on a house, but Parents discarded this opportunity to find stable housing for the Child by depleting the funds on a hotel room. Also, the Child's removal from

16

Parents in 2007 prompted only a temporary period of sobriety, and with this present removal, Parents made no effort to discontinue their drug use until mere weeks before the termination hearing. It is well established that "the time for parents to rehabilitate themselves is during the CHINS process, *prior* to the filing of the petition for termination." *Prince*, 861 N.E.2d at 1230. Even more disturbing to us is Mother's attempt to convince the trial court that she and Father are committed to maintaining their newfound sobriety because they risk losing their *free housing* if they violate Hope Ministries' policies; yet the risk of permanently losing their *Child* was apparently insufficient motivation for Parents to sacrifice their drug habits. Throughout this process, Parents have not only demonstrated a complete aversion to even minimal cooperation with DCS, they have actually blamed and threatened DCS for *their* failed drug screens and *their* absences from visitation and other appointments. Therefore, we find that clear and convincing evidence supports the trial court's determination that termination serves the Child's best interests.[3]

## CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's termination of Parents' parental rights.

Affirmed.

MATHIAS, J. and CRONE, J. concur

---

[3] Parents also claim that DCS deprived them of due process, but because their argument is a reiteration of their assertion that DCS failed to offer adequate services and is devoid of cogent reasoning or references to supportive authority, we decline to address this challenge. App. R. 46(A)(8)(a).

17