## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 21 2016, 8:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Special Assistant to the State Public Defender
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of: R.T., W.T., A.T., K.T., X.J., and A.J., | September 21, 2016 |
| | Court of Appeals Case No. 90A04-1602-JT-302 |
| M.C. (Mother), | Appeal from the Wells Circuit Court |
| *Appellant-Respondent,* | The Honorable Kenton W. Kiracofe, Judge |
| v. | Trial Court Cause No. |
| Indiana Department of Child Services, | 90C01-1507-JT-28 90C01-1507-JT-29 90C01-1507-JT-30 90C01-1507-JT-31 90C01-1507-JT-32 90C01-1507-JT-33 |
| *Appellee-Petitioner.* | |

**Vaidik, Chief Judge.**

# Case Summary

[1] M.C. ("Mother") appeals the termination of her parental rights to her six children. She argues that the evidence is insufficient to prove there is a reasonable probability that the circumstances leading to the children's removal will not be remedied and that termination is in the children's best interests. Concluding that the trial court's judgment terminating her parental rights is not clearly erroneous, we affirm.

# Facts and Procedural History

[2] In 2007, Mother began living with her then-boyfriend, A.T. ("Father"),[1] and her twin sons from a previous relationship, A.J. and X.J, born June 9, 2006. When the twins were two years old, in July 2008, Mother left the home she had been sharing with Father and was homeless. Mother voluntarily placed the twins in the care of the Indiana Department of Child Services (DCS) because she had no place to live. The two boys were placed in foster care and adjudicated children in need of services (CHINS). On January 17, 2009, A.T. was born to Mother and Father. In April, the twins were returned to Mother, and the CHINS case was closed in late June. W.T. was born to Mother and Father February 3,

---

[1] Father voluntarily relinquished his parental rights to his four children and is not a party in this appeal.

2010. Mother and Father were married in November 2010 and had two more children together: R.T., born April 10, 2011, and K.T., born June 10, 2013.

[3] In early January 2014, Mother, Father, and the six children moved into the house of Father's sister who had recently died. A few weeks later, DCS received a report that the children were being neglected and that Mother and Father were using illegal drugs. The next day, DCS went to the house with two deputies and a detective from the Wells County Sheriff's Department to investigate. The house did not have central heat—rather, it had only space heaters in some of the rooms—and it was very cold. There was little food available to eat. The whole family was using only one of the house's bedrooms to sleep. There was a hole in the wall of that bedroom, allowing the winter air to come inside. Sexually explicit magazines, a rifle, broken glass, clothes, toys, and cigarette butts littered the bedroom. Mother and Father were both disoriented, and Mother disclosed that the couple had used methamphetamine that morning. Mother later explained that she had been using heroin regularly for two or three years, but she started switching to methamphetamine about two weeks before the DCS investigation.

[4] DCS met the children at paternal grandmother's house, where Mother and Father had taken them that morning because the water lines were frozen at Mother and Father's house. The children showed signs of neglect. For example, A.T., W.T., and R.T. were developmentally behind for their ages— they were not toilet trained and did not know how to use utensils. All of the children had badly chapped skin, and K.T.'s feet were also discolored, causing

DCS to be concerned that she might have frostbite and to take her to a hospital to be examined. DCS removed the children and placed them in foster care that day. Three days later, the trial court held a detention hearing and found that the children should be removed from the home because of the unfit and unsafe conditions and because of Mother's and Father's methamphetamine use.

[5]     DCS filed a CHINS petition for each of the children, and Mother agreed that the children were CHINS. The trial court entered a dispositional order requiring, in pertinent part:

> 4. The child's mother and the child's father shall accept and successfully complete the following programs or services:
>
>> a. Placement in licensed foster care;
>>
>> b. Substance abuse assessment, follow-up and follow any recommendations;
>>
>> c. Initial clinical evaluation;
>>
>> d. Supervised visitation;
>>
>> e. Random drug screens; and
>>
>> f. Home-based services.
>
> 5. The child's mother and the child's father shall cooperate with the caseworker by maintaining weekly contact, accepting announced and unannounced home visits, providing the caseworker with verification of income and paternity, financial status, change on household composition, and by signing releases. The child's mother and father must report changes to the above information within forty-eight (48) hours, not including weekends and holidays.

Ex. 2, at 20 p. 5-6.[2]

[6] Mother did not comply with the trial court's order. Mother attended the first two visits with her children in February 2014 and missed the third visit. DCS suspended visitation pending a meeting with the family case manager and explained to Mother that the meeting was necessary to restart visitation, but Mother did not attend the scheduled meeting. Mother also refused to provide DCS with current contact information. In May 2014, DCS had to request an investigator to find Mother. In June, Mother reported that she was living with friends, and by October, she had moved back into her mother's home. Finally, in November, she went into treatment at Redemption House for the first time. While she was in Redemption House, DCS arranged one visitation for Mother with K.T. in January 2015. Shortly thereafter, Mother left treatment "[t]o get high[,]" Tr. p. 99, and she moved in with friends. Mother later reported to her addictions counselor that, around this time, she was trading sex for drugs. Also in January 2015, DCS filed petitions to terminate Mother's parental rights.

[7] Mother was arrested in March 2015 and charged with Level 5 felony dealing in methamphetamine, Level 6 felony possession of precursors, and Class A misdemeanor possession of paraphernalia. Mother opted to enter the drug-court program and was placed in Redemption House a second time.

---

[2] The trial court entered a separate order for each child. All of the orders are substantially the same. We cite this one as representative of all six orders.

[8] On June 23, it became clear that DCS could not complete the hearing on the January termination petitions before the 180-day statutory deadline. The trial court dismissed the January termination petitions without prejudice, and DCS filed the current petitions on July 2, 2015.

[9] The trial court held three hearings in August and September, while Mother was still living in Redemption House. In January 2016, the trial court issued an order terminating Mother's parental rights. Relevant to this appeal, the trial court concluded that the conditions that led to the removal of the children from the home were unlikely to be remedied and that termination was in the children's best interests.

[10] Mother now appeals.

# Discussion and Decision

[11] Mother contends that there is insufficient evidence to support the trial court's termination of her parental rights. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the juvenile court. *Id.* We will not set aside the juvenile court's judgment unless it is clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence clearly and convincingly supports the juvenile court's findings and whether the findings clearly and

convincingly support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).[3]

[12] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child[.]

[13] Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re I.A.*, 934 N.E.2d at 1133.

## I. Reasonable Probability That the Conditions Resulting in Removal Will Not Be Remedied

[14] Mother contends that there is insufficient evidence to support the trial court's conclusion that she was unlikely to remedy the conditions that resulted in the

---

[3] Mother contends that two of the factual findings entered by the trial court are unsupported by the record. Because neither fact affects our analysis, we do not address whether there is support in the record for the trial court's finding.

removal of the children. In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and, second, determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* In determining fitness, trial courts have discretion to weigh a parent's prior history against efforts made only shortly before termination, and courts may find that a parent's past behavior is the best predictor of her future behavior. *Id.*

[15] Here, the children were removed because of Mother's failure to supply the children with adequate shelter, care, and supervision, and because of Mother's drug use. Mother argues that at the time of the termination hearing, she had been sober for six months and she "was prepared to meet the basic needs of her children if they were returned to her care." Appellant's Br. p. 15. However, Mother's history with drugs and struggling to care for her children goes back years, not months. Mother had to place the twins, A.J. and X.J., in DCS custody because she had no home in 2008. She testified that she began using prescription medication in 2010 and used heroin daily from approximately 2011 until 2014. When DCS intervened in 2014, Mother was using

methamphetamine, living in squalor with the children, and all of the children showed signs of neglect. Mother further acknowledges that, from January 2014 until March 2015, she "demonstrated a pattern . . . of failing to maintain sobriety and of failing to meet the basic needs of her children." *Id.* at 14. In particular, Mother lived at seven different addresses from January 2014 until she was arrested fourteen months later. After her arrest, Mother spent the remaining months before the termination hearing in the Allen County Jail and Redemption House—also not locations where she could care for her children. She did not complete treatment for her addictions before the first petition to terminate her parental rights, leaving the treatment facility "[t]o get high." Tr. p. 99. At one point, she reported trading sex to get drugs. She refused to tell DCS where she was living. She had no contact with the five older children for nineteen months and no contact with the baby for nine months.

[16] The trial court's conclusion that the conditions will not be remedied is consistent with *Prince v. Department of Child Services*, 861 N.E.2d 1223 (Ind. Ct. App. 2007), which Mother attempts to distinguish. In *Prince*, we concluded that there was sufficient evidence to find the condition leading to removal was unlikely to be remedied because Prince made only limited efforts at treatment until it was ordered as part of her probation in a criminal cause, and treatment did not begin until after the termination petition had been filed. *Id.* at 1230-31. Here, we have substantially the same circumstances. For more than a year, Mother made very little progress toward treating her addiction and reuniting with her children. Then, in March 2015, after the first termination petitions

were filed, Mother was arrested and charged with two felonies and a misdemeanor related to drug use and manufacture. That was when Mother opted into drug court and addressed her addiction issues—when her alternative was to face criminal charges—not when treatment would have facilitated reunification with her children.

[17] Mother is essentially asking us to reweigh the evidence, giving more weight to her recent sobriety than her past history, which we cannot do. *See In re E.M.*, 4 N.E.3d at 642. Based on Mother's history and the circumstances surrounding her recent sobriety, the trial court did not abuse its discretion in determining that the circumstances that resulted in the removal of the children are unlikely to be remedied.

## II. Best Interests of the Children

[18] Mother next argues that termination is not in the children's best interests. In determining what is in a child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied.* In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* "A parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports finding termination of parental rights is in the best interests of the children." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013).

[19] In this case, Mother has a lengthy history of not being able to provide a suitable home environment for her children, and she spent a substantial portion of the time that her children were waiting for her in foster care moving from place to place and using methamphetamine. Consequently, she remained unable to provide a suitable environment for her children at the time of the termination hearings. Beginning in 2008, A.J. and X.J. were adjudicated CHINS because Mother could not provide adequate shelter. That CHINS case was resolved in 2009. Mother was using drugs by 2010, and she was using heroin on a regular basis for two or three years before switching to methamphetamine about two weeks before the CHINS cases underlying these petitions. Throughout the majority of the CHINS proceedings, Mother continued using methamphetamine, she moved frequently, and she had no apparent means of support. Finally, at the time of the termination hearing, twenty months after the children were removed from her care, Mother was living at Redemption House and, although she was finally sober and planning for the future, she was still without the present ability to care for her children. In contrast, DCS presented a satisfactory plan for permanent placement of the children, where they will be cared for by parents who are familiar with the children's special needs resulting from years of neglect.

[20] Based on Mother's historical inability to care for the children and her inability at the time of the termination hearing, the trial court did not err in concluding that it is in the children's best interests to terminate the parent-child relationship with Mother.

Affirmed.

Baker, J., and Najam, J., concur.