## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 19 2015, 9:36 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Jill M. Acklin
McGrath, LLC
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorney Generals
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

| | |
|---|---|
| In the Matter of the Termination of T.P. & D.P. (Minor children) E.N. (Mother), *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, *Appellee-Petitioner.* | August 19, 2015 <br><br> Court of Appeals Case No. 49A02-1501-JT-35 <br><br> Appeal from the Marion Superior Court <br><br> Trial Court Cause Nos. 49D09-1406-JT-278 49D09-1406-JT-279 <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Larry Bradley, Magistrate |

**Pyle, Judge.**

# Statement of Case

E.N. ("Mother"), the mother of T.P. and D.P. (collectively the "Children"), appeals the involuntary termination of the parent-child relationship between her and Children. Throughout the Child in Need of Services ("CHINS") proceeding, Mother did not comply with the parental participation plan because she did not consistently take her medication or consistently participate in treatment or therapy. At the time of the termination hearing, Mother still refused to admit to having a psychological disorder or admit to its connection with Children's trauma. The trial court terminated Mother's parental rights, finding both that the conditions and reasons for continued placement outside of the home that led to Children's removal from Mother's care would not be remedied and that the continuation of the parent-child relationship posed a threat to the well-being of Children. On appeal Mother argues that the Department of Child Services ("DCS") did not present clear and convincing evidence to support the termination of Mother's parental rights. We disagree and affirm the trial court's decision.

We affirm.

# Issue

Whether DCS presented clear and convincing evidence to support the involuntary termination of Mother's parental rights to Children.

## Facts

On June 15, 2013, DCS received a report that Mother had been missing for twenty-four hours and that Children were at her home without supervision.[1] At that time, T.P. was eight years old and D.P. was seven years old. DCS discovered that police had incarcerated Mother on charges of trespass and battery, and DCS filed CHINS Petitions on Children on June 18. DCS then removed Children from Mother's care and placed them in relative care with their paternal aunt. During the initial hearing on July 10, 2013, the court ordered Children be placed with Mother on a trial home visit. However, on July 24, 2013, DCS removed Children because Mother was admitted to the psychiatric unit. She remained hospitalized until July 29, 2013, and, upon her release from the unit, Mother did not follow through with her treatment, medication plan, or therapy because she did not believe she had a mental health issue.

At the fact-finding hearing on August 19, 2013, the court adjudicated Children as CHINS and also ordered Mother to engage in home-based counseling with family participation, submit to random drug screens, and complete a mental health evaluation. For approximately eleven months, Mother was under the court's dispositional decree.

---

[1] M.G., the oldest son, then seventeen years old, reported Mother missing. However, M.G. is not a part of this proceeding.

[4]    In August 2013, Children started therapy with Jessica Ramey ("Ramey"). Children had been discussing with Ramey the trauma that they experienced while living with Mother. Ramey summarized Children's traumatic conditions that were related to Mother's mental health issues, as follows:

> they didn't have enough food, that mom would get sick . . . and she would talk to herself and she would leave for days at a time. They were never sure when she was going to come back home. It was very scary for them. They were afraid that she was going to hurt somebody when she was having these mental health events. And this had occurred for a period of two years according to [T.P].

[5]    (Tr. 97). Ramey diagnosed Children with post-traumatic stress disorder due to the trauma at home with Mother. Ramey noted that Children would have "bedwetting, [and] nightmares" after they visited Mother. (Tr. 95). Children would also have "intrusive thoughts" about traumatic things they had experienced. (Tr. 97). During therapy, T.P. stated that "there were other [bad] things that happened" while in Mother's care that he was not ready to discuss.[2] (App. 62; GAL Ex. XIII).

[6]    Dr. Jeffrey Vanderwater-Piercy ("Dr. Vanderwater-Piercy"), a clinical psychologist, performed an evaluation on Mother in January and February of 2014, and diagnosed her with a "Psychotic disorder . . . not otherwise

---

[2] At the termination hearing, Ramey also testified that there had been some sexual abuse concerns regarding Children, and the Guardian Ad Litem ("GAL") testified that there had been allegations that M.G. had "sexually perpetrated" them. (Tr. 153).

specified."[3] (Tr. 165). Dr. Vanderwater-Piercy explained that Mother's denial of her mental illness affected her risk of relapse and recommended that she participate in home-based therapy.

[7] In March 2014, Mother had two scheduled visits with Children at Mother's home that were supervised by Ramey. Mother participated in both visits but seemed detached from Children at the second visit. At a scheduled visit on April 2, 2014, Mother stayed upstairs and did not come down to visit with Children. The oldest son, M.G., who was still living with her, advised Ramey that "it would not be good for [Children] for her to participate in the visit that day." (Tr. 106).

[8] A few days later, on April 8, 2014, Mother's therapist and her home-based case manager went to see Mother at her home, and they reported that "[Mother] was clearly . . . having some kind of mental health event[.]" (Tr. 108). Soon thereafter, Mother was hospitalized for a "mental breakdown[.]" (Tr. 49). Thereafter, the court suspended Mother's visitation. In June 2014, DCS filed a petition for termination of parental rights.

[9] On July 25, 2014, Mother went to the aunt's house and threatened to harm her. That same day, Mother was hospitalized again due to her mental health issues. Additionally, the court issued a no-contact order on August 20, 2014 at the

---

[3] At the termination hearing, Dr. Vanderwater-Piercy testified that a psychotic disorder is "a category of . . . different disorders which are marked by either hallucinations, delusional beliefs or a . . . marked impairment in thinking such as [an] incoherent thought or speech or grossly disorganized behavior." (Tr. 165).

CHINS hearing, ordering Mother not to have contact with Children or the aunt. On July 21, 2014, during a DCS family meeting, Mother appeared "extremely agitated" and "seemed very out of touch with reality." (Tr. 118). Ramey "observed that [Mother] was talking to herself in a way that was indicative that she was trying to get a response from someone that wasn't" there and "was not responding to the questions that were being asked of her and was instead responding to some other stimulus . . . that could not [be] see[n]." (Tr. 119).

[10] Prior to the termination hearing, GAL petitioned the court, pursuant to INDIANA CODE § 31-35-4, to make some of Children's out of court statements admissible at the termination hearing and to determine the competency of Children as witnesses. The statements at issue were some of Children's statements made to Ramey during therapy and written down in her therapy notes. In part, in these statements, Children reported that they felt unsafe around Mother because of her mental illness and that they did feel safe with the aunt. After holding a hearing, the trial court granted GAL's request and found that "there exists sufficient indications of reliability due to time, content, and circumstances of the children's statements." (App. 74). The trial court further found that the statements were admissible only if Children testified pursuant to INDIANA CODE § 31-35-4-3 because "they ha[d] been found to be available as witnesses by a psychiatrist." *Id*. Additionally, DCS petitioned, pursuant INDIANA CODE § 31-35-5-2, that Children testify through a closed circuit

testimony at the termination hearing. (App. 78). The trial court granted the request. (App. 81).

[11] At the termination hearing on December 10, 2014, DCS presented evidence regarding Mother's refusal to acknowledge her mental illness and its connection to Children's reported trauma. Ramey testified that Children had made "remarkable progress" in therapy since the court suspended Mother's visitation. (Tr. 114). Ramey also stated that Children did not want to return to Mother's home because they "fe[lt] safe and secure in their relative placement." (Tr. 113). Children testified that they both enjoyed living with their aunt and did not want to go back with Mother.

[12] DCS, GAL, and Ramey all recommended that the court terminate Mother's parental rights because it was in Children's best interest. Specifically, Ramey testified that:

> Even if [Mother] is not actively psychotic today[,] there is evidence to support that she has been in the past. Psychosis is a mental health diagnosis that manifests in re-occurrences so I would be concerned about having a reoccurrence of psychosis in the future[,] which would be traumatic for the boys.

(Tr. 116).

[13] Mother did not challenge the factual evidence presented at trial by DCS. However, Mother's home-based therapist testified on behalf of Mother's progress and stated that in the four months preceding the termination hearing, Mother had shown "steady progress" by working a full-time job and maintaining a stable mood by consistently taking her medication. (Tr. 194).

She also testified that Mother had maintained stable housing and had her driver's license and a car. The home-based therapist stated that Mother's consistency showed that she was capable of being compliant. However, the trial court was not convinced.

On December 23, 2014, the trial court found, in relevant part, that (1) Mother would not remedy the conditions of removal and reasons for continued placement outside the home; and (2) that the continuation of the parent-child relationship posed a threat to Children's wellbeing. In regard to the reasons for continued placement outside the home, the trial court concluded:

> There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their mother. The children were placed in the home at one time, visits were placed in the home, and the children were close to being placed in the home a second time. However, [Mother's] mental illness became a barrier and she continues to deny it is an issue . . . . Termination would allow [Children] to be adopted into a stable and permanent home where their needs will be safely met and they can continue to progress in therapy.

(App. 20). The trial court determined that the permanent termination of Mother's parent-child relationship was in the best interest of Children and terminated Mother's parental rights. Mother now appeals.

## Decision

Mother argues that DCS did not present clear and convincing evidence that she would not remedy the conditions resulting in the removal or continued placement of Children outside of her care. Mother also contends that the

continuation of the parent-child relationship would not pose a threat to Children's wellbeing.

[17] "[W]hen seeking to terminate parental rights, DCS must prove its case by 'clear and convincing evidence[.]'" *In re E.M.,* 4 N.E.3d 636, 642 (Ind. 2014) (quoting IND. CODE § 31-37-14-2). This Court will "consider only the evidence and reasonable inferences therefrom that support the [court's] judgment" terminating parental rights. *Prince v. Dep't of Child Services*, 861 N.E.2d 1223, 1229 (Ind. Ct. App. 2007). We will not "reweigh the evidence or reassess the credibility of the witnesses" during our review. *Id.* Although the "Fourteenth Amendment to the United States Constitution gives parents the right to establish a home and raise their children[,]" it "is balanced against the State's limited authority to interfere for the protection of the children." *Id.*

[18] The State may terminate a parent's rights if they demonstrate by clear and convincing evidence, in relevant part, that:

> (B) . . . one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

[19] I.C. § 31-35-2-4. Mother argues that DCS failed to present clear and convincing evidence of either statutory element. Our supreme court has stated that DCS need prove only one of the two elements by clear and convincing evidence in

termination proceedings. *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005) (holding that if the court finds that the parent would not remedy the conditions for removal, there is no need to prove the other element). Therefore, we will address only Mother's argument regarding the conditions remedied and reasons for placement outside the home.

[20] In regard to this argument, Mother relies on the testimony of her home-based therapist and contends that because she has shown significant progress leading up to the termination hearing by participating in treatment, and maintaining employment and housing, DCS did not present clear and convincing evidence that the past conditions and reasons for continued placement outside the home would not be remedied. (Tr. 211).

[21] In determining whether the reasons for the removal of Children and continued placement outside the home will be remedied, "[w]e engage in a two-step analysis." *In re K.T.K*, 989 N.E.2d 1225, 1231 (Ind. 2013). We first look at the conditions "that led to their placement and retention in foster care[,]" and then "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id*. (quoting *In re I.A.,* 934 N.E.2d 1127, 1134 (Ind. 2010) (additional citation omitted)). "[T]he trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester*, 839 N.E.2d at 152. The trial court also has the discretion "to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M*, 4 N.E.3d at 643. "Requiring trial courts to give due regard to changed conditions does not

preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id*. Therefore, "DCS need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[22] We disagree with Mother's assertion that DCS has shown no clear and convincing evidence that Mother would not remedy the conditions or reasons for continued placement. Although Mother's home-based therapist testified that she had shown "steady progress," evidence showed that DCS removed Children from Mother's care after DCS received a report that Mother had been missing for twenty-four hours and Children were unsupervised. (Tr. 194). Similarly, during the CHINS proceedings, the trial court suspended Mother's visits and issued her a no-contact order because of her hospitalizations and threatening statements toward the aunt. Evidence also revealed that Mother refused to follow through with her medication, therapy, and treatment plan after her initial release from the psychiatric unit, alleging that she did not need the treatment because she did not have a psychotic disorder. We acknowledge Mother's argument that the initial reason for removal of Children from the home (i.e., Mother's arrest and leaving Children unsupervised) was remedied. However, here, there were subsequent reasons such as her denial of her mental health issues and its effect on Children that required continuous placement.

[23] While Mother may have made some progress just prior to the termination hearing, the evidence revealed a history for Mother that demonstrated an

inability or unwillingness to deal with her mental health issues and a failure to acknowledge its negative effect on Children. Children had been diagnosed with post-traumatic stress disorder due to traumatic experiences while in Mother's care. The evidence suggests that if Mother relapsed while Children were in her care, her relapse could cause long term issues for Children. Therefore, Mother's argument amounts to nothing more than a request for this Court to reweigh the evidence presented, which we will not do. *Prince*, 861 N.E.2d at 1229. We conclude that there was clear and convincing evidence to support the trial court's decision to terminate Mother's parental rights to Children.

Affirmed.

Crone, J., and Brown, J., concur.