## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 25 2017, 8:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael B. Troemel
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of B.C., Mother, and Z.R. and J.R., Children,

B.C.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 25, 2017

Court of Appeals Case No.
79A02-1702-JT-339

Appeal from the
Tippecanoe Superior Court

The Honorable
Faith A. Graham, Judge
The Honorable
Tricia L. Thompson, Magistrate

Trial Court Cause No.
79D03-1606-JT-62,
79D03-1606-JT-63

**Kirsch, Judge.**

[1] B.C. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor children, Z.R. and J.R. ("Children"). Mother raises one issue on appeal that we restate as whether the juvenile court's order terminating her parental rights was clearly erroneous

[2] We affirm.

## Facts and Procedural History

[3] Mother and D.R. ("Father") are the biological parents of Children.[1] In December 2014, Indiana Department of Child Services ("DCS") received a report that Mother and Father ("Parents") engaged in domestic violence, Mother threatened to harm Children, and she threatened to harm herself. At the end of January 2015, DCS filed a petition alleging that Children were Children in Need of Services ("CHINS") because of, as is relevant here, housing instability, lack of care of Children, domestic violence, and Mother's mental health issues. *Exhibits Vol. I* at 49-61 (DCS Ex. 2). In February 2015, Children were taken into DCS custody. At the March 17, 2015 fact-finding hearing, Parents admitted the allegations in the CHINS petition. *Id*. at 31 (DCS Ex. 1). On March 23, 2015, the court adjudicated Children as CHINS.

---

[1] The juvenile court also terminated the Father's parental rights to Children, but he does not participate in this appeal. Accordingly, we will limit our recitation of facts and our analysis to that which is pertinent to Mother.

[4] The April 2015 dispositional order required Mother to participate in reunification services pursuant to a parental participation decree, including the following: a psychological evaluation and all recommendations; either Character Restoration or domestic violence counseling and all recommendations; a substance abuse evaluation and all recommendations; home-based case management and all recommendations; supervised visitation; and individual counseling. *Id*. at 28-30, 62 (DCS Exs. 1, 2).

[5] Written Progress Reports were filed for the periods of April 2015 through June 2015, June 2015 through October 2015, October 2015 through January 2016, and January 2016 through May 2016, and review hearings were held in June 2015 and October 2015. A permanency hearing was held in June 2016, and the CHINS court issued its permanency order and approved the initiation of termination proceedings. In July 2016, DCS filed its petition to terminate Parents' parental rights. The juvenile court held an evidentiary hearing on August 18, 2016, which was completed on October 20, 2016.

[6] Deb Apple ("Apple"), a therapist and clinical supervisor with Counseling Partners, testified at the August hearing. Apple provided individual counseling to Mother, beginning in October 2015 and continuing through the date of the termination hearing in August 2016. The issues that Apple sought to address were domestic violence, past trauma, healthy relationships, coping skills, setting boundaries, anger management, self-esteem, depression, and anxiety. *Tr*. at 99-100. Although Mother made "great improvement" initially, she regressed, as evidenced by resumed physical altercations and police contacts. *Id*. at 100.

Apple testified that Mother had a difficult time managing her anger, which at times was triggered by hurtful and derogatory comments by Mother's grandmother, with whom Mother lived. Apple discussed with Mother the goal of moving out of grandmother's house, where physical violence was often used to resolve conflict in the home, which Apple found "very concerning." *Id.* at 105. Apple described that Mother used her learned coping skills for a while, "but then she just began not using any of them." *Id.* at 104. Apple described Mother's progress throughout the case as being a "bell curve" – showing improvement and then sliding back – not only with regard to domestic violence, but all the issues that they had been working on. *Id.* at 103. Apple stated that Mother was making the same types of poor decisions as when Apple first met her. When asked about Mother's status as of the hearing, Apple replied, "I believe she is still digressing." *Id.* at 111.

[7] Lorie Clester ("Clester") of Child and Family Partners also testified. Clester supervised visitations and also provided case management to assist the family in reaching the DCS goals; she began working with the family in March 2015 and was still working with the family as of the date of the August 2016 hearing. Clester stated that supervised visitations were three times per week from March 2015 to May 2016, but had been reduced to one visit a week due to Mother's "inconsistent participation."[2] *Id.* at 117. According to Clester, Mother missed

---

[2] Clester testified that she supervised visits between Mother and Children and that Father either had separate visitations or was not having any. *Tr.* at 117.

thirty-two or thirty-three visits over the course of seventeen months. Mother's reasons for nonattendance were lack of transportation, illness, and domestic violence incidents, which involved family members, acquaintances, and Father. Clester believed that Mother's cancellations were "very devastating" for Children, who needed the consistency and routine of seeing their parents. *Id.* at 121. Clester testified that she wanted to terminate services completely in July 2016, but continued with one per week at DCS's request.

[8] One issue that Clester sought to address with Mother was her lack of bonding with Children, especially with J.R., which improved such that Mother eventually showed equal amounts of attention and affection to both children. Another primary issue was Mother's lack of supervision of Children, and while "[t]here were certain things that she learned to do," Clester stated that "overall the safety concerns were pretty consistent throughout this entire time[,]" and Clester never recommended unsupervised visitation. *Id.* at 124. Clester testified that, as of the termination hearing, Mother still required intervention to keep Children safe. Clester's concerns with Mother's parenting ability to keep Children safe were the same as when the case started.

[9] With regard to employment, Clester testified that Mother secured brief employment several times, but she left at least a couple of those jobs due to issues with fellow employees. At some point, Clester took Mother to "Voc Rehab," and they set up an appointment for Mother to meet with a counselor, but Mother did not follow through with it. *Id.* at 133. In Clester's view, Mother's employment history showed a lack of stability. *Id.* at 128. With

regard to housing, Mother did not qualify for assisted housing because of two prior evictions. Clester accompanied Mother to appointments at Social Security, where she sought to receive disability, but Mother did not follow through with obtaining the necessary records. Clester testified that Mother did not meet any of the goals that had been set for her, and when asked if Mother "has the ability to parent her children today," Clester replied, "No." *Id.* at 131.

[10] Arielle Falardeau ("Falardeau"), a mental health counselor with Counseling Partners, also testified. She facilitated therapeutic parenting time for Mother and Children, which she explained was "the highest level of supervision for parenting time" and provides education and addresses needs beyond the basic safety needs of the children. *Id.* at 144. She began working with Mother and Children in June 2015 and worked with them from one to three hours per week, but Mother's visits were being decreased and the last time Falardeau saw the family was in June 2016. Falardeau stated that Mother made progress with implementing effective and age-appropriate communication with Children and she also improved on encouraging positive sibling interaction, but Falardeau's concerns with adequate supervision remained the same as they were in the beginning.

[11] DCS also presented the testimony of Family Case Manager Lauren Wheeler ("FCM Wheeler"). She was assigned to the case in December 2015, during the CHINS proceeding, and she noted that there had been two FCMs prior to her involvement. She reviewed that the original reason for Children's removal in February 2015 was instability with housing, domestic violence issues with the

parents, and mental health issues with Parents. Children were first placed with family friends, but then were moved to foster care, where they remained and were "[d]oing great." *Id*. at 172. FCM Wheeler stated that DCS never considered returning Children to the care of Parents because the conditions that led to removal have continued and there was a lot of physical violence between Parents, family members, and others; she estimated that Mother had been in ten or fifteen physical fights during the course of the action.

[12] In the March 2015 CHINS parental participation orders, Mother was ordered to do a mental health assessment and a substance abuse assessment, and participate in case management and visitation. FCM Wheeler explained that Mother's mental health assessment, which was a psychological evaluation, recommended mental health treatment through medication management, individual therapy, and case management services. Mother's substance abuse assessment did not reveal substance abuse. FCM Wheeler said that she received reports that Mother "doesn't take her medications as prescribed or doesn't want to be on them and doesn't follow doctors' recommendations." *Id*. at 178. Given that Mother's mental health instability was one of the major reasons for DCS's involvement, FCM Wheeler was very concerned about her failure to follow doctors' recommendations. With regard to case management, FCM Wheeler stated that Mother's participation was "sporadic." *Id*. at 177. She had not reached "many of her goals" such as finding stable housing and employment, and she described it as "slow progress." *Id*. at 178. FCM Wheeler said that Mother was "one no-show away from being discharged

unsuccessfully" and that they would have discharged her sooner except that they had given her more opportunities out of concern that it would be detrimental to Children to switch visit facilitators.[3] *Id.* at 178-79. Overall, FCM Wheeler described Mother's progress as "unsuccessful and slow" with "spurts of doing better but quickly falls back again." *Id.* at 180. At the time of the termination hearing, FCM Wheeler had the same concerns as when she began the case:

> [T]he parents have continued to not only keep in touch with one another and engage in domestic violence, but they also engage in domestic violence with other family members, friends, strangers. Both parents do not have stable, safe housing. [Mother] has recently obtained employment, but it's not been consistent throughout the case and maintained for financial support for the children.

*Id.* at 187-88. FCM Wheeler testified that termination was in the best interest of Children and that the plan of care was adoption with the current home.

[13] At the termination hearing, Mother testified that she participated in counseling services with Apple, and they worked on domestic violence issues, which Mother described as "how to keep myself safe" and be in healthy relationships, *id.* at 19, as well as anger issues and life skills. Mother testified to being in a physical fight with Father in July 2016, the month prior to the termination

---

[3] The record before us indicates that, at some point between October 2016 and December 2016, Mother was discharged unsuccessfully from individual therapy, parenting time, and case management services for violating Counseling Partners' attendance policy. *Appellant's App. Vol. II* at 31.

hearing, where they hit each other and Father scratched her with a knife. She also testified to being present but not participating in a "brawl" in June 2016, with guns and fighting. *Id*. at 21. When asked if she was involved in any altercations in April, she responded, "Probably" and indicated that there had been ongoing incidents throughout the whole course of the case. *Id*.

[14] With regard to parenting time, Mother shared that she found it difficult when she cared for Children at the same time and experienced "trouble with juggling them both." *Id*. at 22. She noted that, at first, the parenting time sessions were three times per week, "So I had to attend all of them and then it went down to two days a week and now it's one day a week, so I have to attend one day a week." *Id*. As far as employment, she testified that she had been hired at Meijer, but could not attend the first day because it conflicted with the termination hearing, but Meijer was going to reschedule. With regard to her mental health, Mother testified that a psychiatrist wanted Mother to take medication for anxiety and depression, but that she was not taking any medication because her Medicaid "had gotten shut off[.]" *Id*. at 27. She also testified that she did not want to take the recommended medications and did not think that she needed them. She explained that she did not like how the medications made her act, including making her feel more aggressive, but acknowledged that sometimes she would "overdo it" by taking four pills of Klonopin per day when she was supposed to take two. *Id*. at 28. When asked about housing, Mother testified that Clester had been helping her to find housing and with seeking Social Security disability, but Mother did not

complete the Social Security application process because she did not understand it and was having trouble completing the required online paperwork. *Id.* at 31.

[15] The termination hearing was continued to, and completed, on October 20, 2016. At that time, Mother testified that she was employed at Meijer, had started to prepare a budget and was saving money for future housing and expenses, and had applied for a second job. She testified that she was in special education classes in high school, did not continue school after tenth grade, and did not get a GED. During FCM Wheeler's testimony, she stated that testing of Mother's intellectual functioning revealed "a very low IQ[,]" and Apple testified that Mother has "borderline intellectual functioning." *Id.* at 107, 190.

[16] On January 17, 2017, the juvenile court issued an "Order for Involuntary Termination of Parental Rights," which included findings of fact and conclusions of law. *Appellant's App. Vol. II* at 32-39. Mother now appeals.

# Discussion and Decision

[17] The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore,

parental rights are not absolute and must be subordinated to the child's best interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

[18] The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[19] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[20] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the

juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[21] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:

> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree; (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied. (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[22] On appeal, Mother "does not dispute the TPR findings of fact." *Appellant's Br.* at 7. As a result, Mother has waived any argument relating to these unchallenged findings. *See In re B.R.,* 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure to challenge findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied.* Nor does Mother expressly challenge the juvenile court's conclusions; indeed, she concedes that "[t]here is testimony in the record that [M]other did not make progress toward the goals of stable housing, employment, social security, and transportation[.]" *Appellant's Br.* at 7. The crux of Mother's argument is that the juvenile court "adjudicated the children in need of services upon finding that coercive intervention of the court was needed[,]" but it "did not use its substantial powers to procure [M]other's compliance with court mandates" and, instead, "maintained the children out of the home, forcing no real responsibility on [M]other[.]" *Id*. at 7, 9. Mother urges that she "was basically allowed to flounder for over a year, until the time requirement for TPR was met." *Id*. at 13.

[23]   Mother appears to be asserting that the juvenile court should have done more during the CHINS proceeding to prevent the process from ever reaching the termination stage, including holding more review hearings and placing Children in the home with Mother to "forc[e] hands on work, face to face with [C]hildren."[4] *Id.* As an initial matter, we observe that Mother did not raise the now-asserted deficiencies with the CHINS proceedings until now, and thus she has waived them. *See In re S.P.H.*, 806 N.E.2d at 877-78 (Father who appealed termination of parental rights waived claims concerning DCS's alleged failures to comply with CHINS statutory requirements when he raised them for the first time on appeal); *Smith v. Marion Cnty. Dep't of Pub. Welfare*, 635 N.E.2d 1144, 1148 (Ind. Ct. App. 1994) (time for appealing issue in CHINS proceeding commences when dispositional decree is entered and party may not raise issue for first time on appeal from termination proceedings), *trans. denied*.

[24]   Waiver notwithstanding, to the extent that Mother suggests that the juvenile court should have placed Children with her, the evidence presented was that Mother continued to have problems controlling her anger, continued to be involved in domestic violence and other fights, had difficulty handling Children at the same time, was living in grandmother's home, which included conflict and violence, and did not have employment or housing stability. To the extent that Mother suggests the juvenile court should have done more, such as citing

---

[4] Mother's requested relief on appeal is to reverse the termination of parental rights and remand with specific directions to the juvenile court that include returning Children to Mother's care, requiring additional oversight by DCS, and having mandatory review hearings. *Appellant's Br.* at 14-15.

her for contempt or imposing sanctions, *Appellant's Br.* at 13, Mother fails to cite to any authority that the juvenile court was required to do so, and her claim is waived for failure to support it with cogent argument or authority. Ind. Appellate Rule 46(A)(8)(a). In any event, the record before us indicates that the juvenile court was regularly apprised of the status of Mother's participation, as it held at least two review hearings and received four progress reports from DCS between the months of April 2015 and May 2016, before DCS filed its petition to terminate in July 2016.

[25] As this court has recognized, "[I]f the parent feels the services ordered by the court are inadequate to facilitate the changes required for reunification, then the onus is on the parent to request additional assistance from the court or DCS." *Prince v. Dep't of Child Servs.,* 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007) (rejecting claim that responsibility for parent's failure to achieve and maintain sobriety belonged to trial court or DCS). Moreover, "[A] failure to provide services does not serve as a basis on which to directly attack a termination order[.]" *In re H.L.*, 915 N.E.2d at 148 n.3 (citing *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) (any alleged noncompliance by DCS in provision of services "would be a matter separate and distinct from the operation of our termination statute").

[26] Our review of the record reveals no error in the juvenile court's decision to terminate Mother's parental rights to Children. The evidence presented was that the conditions that existed at the time of removal continued to exist, including domestic violence, instability in housing and employment, untreated

mental health issues, and inability to safely parent Children. Mother continued to engage in domestic violence incidents throughout the course of this case, including with Father. According to DCS witnesses, Mother's participation in services during the CHINS and termination proceedings was sporadic, and while she showed some progress, she regressed to being at the same point as she was in the beginning. The evidence presented was that Children are "doing great" in foster care, and DCS's plan is for adoption with that family. *Tr.* at 172.

[27] "[A] trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *In re A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1253 (Ind. Ct. App. 2002), *trans. denied.* Furthermore, we will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Here, Mother has not demonstrated that the juvenile court's conclusions – that (1) there is a reasonable probability that the conditions that resulted in the removal of Children from Parents' care or the reasons for continued placement outside the home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to Children's well-being, (3) DCS has a satisfactory plan for the care and treatment of Children, and (4) it is in Children's best interests that Mother's parental rights be terminated – are clearly erroneous.

Affirmed.

Najam, J., and Brown, J., concur.