## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 08 2019, 8:53 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT A.M.

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR APPELLANT S.M.

Amy Karozos
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of Bai.M., Brax.M., and Bran.M. (Minor Children) and A.M. (Mother) and S.M. (Father)

A.M. (Mother) and
S.M. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

May 8, 2019

Court of Appeals Case No.
18A-JT-2089

Appeal from the
Adams Circuit Court

The Honorable
Chad E. Kukelhan, Judge

Trial Court Cause Nos.
01C01-1801-JT-09
01C01-1801-JT-14
01C01-1801-JT-15

**Vaidik, Chief Judge.**

# Case Summary

S.M. ("Father") and A.M. ("Mother") (collectively, "Parents") appeal the termination of their parental rights to their three children. We affirm.

# Facts and Procedural History

Father and Mother are the parents of Bran.M., born in 2008; Bai.M., born in 2011; and Brax.M., born in 2013 (collectively, "Children"). The facts that follow are taken primarily from the trial court's findings of fact, none of which Parents challenge on appeal.[1]

Parents first became involved with the Department of Child Services (DCS) in 2012. DCS substantiated allegations of neglect due to the condition of Parents' house and for lack of supervision of Bran.M. and Bai.M. (Brax.M. was not born yet). DCS entered into an informal adjustment with Parents and provided services to help them improve the condition of their house. Bran.M. and Bai.M. remained in Parents' care. Then in 2013, while the informal adjustment was ongoing, DCS substantiated another allegation of neglect for Parents' lack of supervision of Bran.M. and Bai.M. Parents continued receiving services, and at some point DCS closed the case.

---

[1] Because Parents do not challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

[4] Two years later, in June 2015, DCS received a report alleging that Children were victims of neglect. The report alleged that the family was living in the basement of Father's dad's house and the conditions of the house were "horrid." Tr. Vol. I p. 10. On June 16, Family Case Manager (FCM) Laurie Hoffacker visited the house to investigate. Mother allowed FCM Hoffacker to enter the house but cautioned that the house "was kind of messy." *Id*. at 12. When FCM Hoffacker entered the first floor of the house, she saw that there were flies and other insects swarming around the ceiling and that the carpet was covered in dirt. FCM Hoffacker went into the kitchen and saw that the sink was full of dirty dishes and that there was old food in the microwave. As FCM Hoffacker approached the stairway to the basement, where the family was living, she noticed that the "flying insects and flies were thicker and there was a definite odor of unclean and dog feces." *Id*. When FCM Hoffacker walked down the stairs into the basement, she saw the basement floor was covered in "a pile of clothing, trash, that was as high as the bottom step" that continued "throughout the rest of the basement." *Id*. FCM Hoffacker also saw "dog feces," "eggs shells," and "food" spread all over the basement floor. *Id*. When FCM Hoffacker looked up, she saw that some of the ceiling tiles were missing and that some "dropped down to where they appeared to be in danger of falling." *Id*. FCM Hoffacker saw that one of the ceiling tiles looked like it was going to fall directly onto one of the children's beds. FCM Hoffacker also checked on Children, who were two, three, and seven years old at the time, and observed that the "bottoms of their feet were black." *Id*. at 15. At that point,

FCM Hoffacker decided to remove Children and requested assistance from the Decatur Police Department.

[5] Officer Kevin Gerber arrived to assist FCM Hoffacker. Officer Gerber went inside the house and saw that the basement was "covered in clothing, toys, or trash." *Id*. at 14; *see also* Ex. 3. Officer Gerber noticed "[f]eces on the floor in multiple locations" and "[s]uch a high quantity of flies flying around the basement" that he would later report, "I felt like I was breathing them in." Ex. 3. After seeing the house, Officer Gerber contacted the Adams County Health Department. Joe Spaulding from the health department arrived and, after seeing the condition of the house, told Officer Gerber that the house would be condemned. Officer Gerber spoke with Parents and explained that the house was going to be condemned. After conferring with DCS case managers, Officer Gerber arrested Parents for Level 6 felony neglect of a dependent. Children were removed from Parents' care and placed in foster care in the home of P.G. DCS then filed petitions alleging that Children were in Need of Services (CHINS).

[6] In July, the trial court held a fact-finding hearing on the CHINS petitions, and Parents admitted that the Children were CHINS. After the hearing, the trial continued Children's foster-case placement and ordered that Parents participate in numerous services, "maintain suitable, safe, and stable housing with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities," and "keep the family residence in a manner that is structurally sound, sanitary, clean, free from clutter and safe for [Children]."

Ex. 28. Later, Parents pled guilty to Level 6 felony neglect of a dependent and were sentenced to 545 days of probation.

[7] After the house was condemned, Parents briefly stayed with a friend, then at the Matador Inn for a month-and-a-half, and then with Mother's relatives until they secured their own apartment in June 2016. During that time, DCS provided Parents with numerous services, including case-management services, supervised visitation, psychological assessments, individual therapy, and homemaker services to help Parents with budgeting. Through the rest of 2016 and into the beginning of 2017, the trial court held periodic review hearings and continued to find that while Parents were "cooperating with DCS," they had "not enhanced [their] ability[ies] to fulfill [their] parental obligations." Ex. 44; *see also* Exs. 45-49. In September 2016, DCS began providing Parents with Family Centered Treatment (FCT), the most intensive program available through DCS, and, after six months of FCT, Children were returned to Parents' care for a trial home visit in March 2017. In May, Parents' FCT provider reported that she believed that Parents could maintain a clean house on their own so she discharged Parents from FCT. However, by the end of July, Children were once again removed from Parents' care due to unsanitary home conditions. On July 20, Parents' new FCM, Christina Gaspar, made an unannounced visit to Parents' house and found that there were items "wall to wall on the floor," "food on the floor where ants had gathered," and "cockroaches on the cabinet doors, counter, stove, floor, and inside the refrigerator." Ex. 55. Parents were given twenty-four hours to clean their

house, but by the next day, although some progress was made, there were still cockroaches throughout the kitchen. DCS made several more visits to Parents' house but no more improvements were made. Thereafter, DCS filed a motion for a more restrictive placement for Children. On July 31, the trial court held a hearing on DCS's motion and found that Parents "failed to maintain their house in a clean and sanitary condition." *Id*. After the hearing, the trial court ordered that the trial home visit end and that Children be placed back in foster care.

[8] After Children were removed for the second time from Parents' house, the trial court held periodic review hearings through the remainder of 2017 and into the beginning of 2018. Throughout these review hearings, the trial court found that Parents "participate and complete services, but don't benefit completely from said services" and "have not enhanced their ability to fulfill their parental obligations." Ex. 59. Additionally, the trial court found that visitations were not going well because Mother "makes comments in front of [Children] regarding the foster parents and has cursed in front of [Children] during visits." *Id*. Likewise, the trial court found that Father must be redirected during visits "due to comments he has made to the children." *Id*. Finally, the trial court concluded that Parents were not cooperating with DCS and that Parents "do not follow through and maintain stability for their family." *Id*.

[9] In January 2018, DCS filed petitions to terminate Parents' parental rights to Children. In June, the trial court held a fact-finding hearing on the termination petitions. FCM Hoffacker testified that when she was working with the family,

DCS decided to put FCT in place "because it's the most intensive home based program that we have available to us and it was . . . kind of a last ditch effort to work towards reunification." Tr. Vol. I p. 20. FCM Hoffacker said that after FCT discharged Parents, no other services were recommended because Parents had to "show that they could parent on their own." *Id*. at 56. FCM Gaspar testified that DCS referred Parents to case-management services and referred Mother to Park Center for medication management. Regarding Parents' house condition, FCM Gaspar said that DCS worked with Parents in "pretty much any way we could without going in there and basically cleaning the apartment ourselves." *Id*. at 74. As for Parents' progress, Gaspar said that toward the end of her time as their FCM, Parents startied "missing visits" and "cancelling case management appointments." *Id*. at 78. Parents' current FCM, Jeff Boolman, testified and explained that DCS made the decision to remove services, such as case management, in February 2018 because Parents "had just about every service [DCS] can provide and we decided that we've reached a point if [Parents] were going to try to have [Children] in their home, [Parents] would have to prove that they could maintain a home that's safe for [Children] without services being in place." *Id*. at 171. FCM Boolman also said that termination of Parents' parental rights is in Children's best interests because Parents "are not able to be motivated to be parents to [Children] without having a service provider in their home twenty-four hours a day telling them what to do." *Id*. at 195. Misty Thornburgh, Parents' homemaking service provider, testified that she would give Parents a budget worksheet to bring back to her but that she "never got one turned back in." *Id*. at 150. After working with Parents

for about a year, Thornburgh said that Parents had made no progress "[a]s far as the[ir] budgeting." *Id*. at 154.

[10] Children's foster parent, P.G., testified that when Children were removed from Parents' care, Brax.M. was "almost blind in one eye. [Doctors] said he should have had glasses a long time before we got him and . . . he ended up having surgery on his one eye." *Id*. at 112. P.G. also testified that neither Bai.M. or Brax.M. were potty trained but that in the two years they stayed with his family, they were both potty trained. However, after the trial home visit ended, P.G. said that four-year-old Brax.M. came back in diapers. *See id*. at 122. Bran.M.'s therapist, Riley Powell, testified that Bran.M. has a "diagnosis of autism and oppositional defiant disorder" and that for him, structure and consistency is very important. *Id*. at 96. Children's Guardian ad litem (GAL), Beth Webber, a licensed attorney, testified that she was concerned about Parents missing Childrens' medical appointments and about the cleanliness of Parents' house. GAL Webber also stated that she believes it is in Children's best interests if Parents' parental rights are terminated. FCM Boolman and GAL Webber testified that the plan is for Children to be adopted. *See id*. at 194, 219.

[11] In July, the trial court issued its order, concluding: that Children had been removed from Parents for at least six months under a dispositional decree; that Children had been removed from Parents under the supervision of DCS for at least fifteen of the most recent twenty-two months; that there was a reasonable probability the conditions resulting in removal of Children from the home of

Parents or the reasons for placement of Children outside the home of Parents would not be remedied; that continuation of the parent-child relationships posed a threat to the well-being of Children; that there was a satisfactory plan for the care and treatment of Children—adoption; and that termination was in Children's best interests. The trial court terminated Parents' parental rights.

Father and Mother separately appeal.

# Discussion and Decision

Parents' briefs touch on several different topics, and we consolidate their arguments and address them as one where possible.

# I. Parents' Due Process

First, Parents argue that DCS failed to provide services or failed to provide the right services and that this violated their due-process rights. Specifically, Mother alleges that "the recommended services were not the right services needed to reunify this family," Mother's Reply Br. p. 8, whereas Father contends that "he [was not] aware [of] what needed to be addressed and [was not] provided services," Father's Br. p. 17. It is true that when the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *Hite v. Vanderburg Cty. Office of Family & Children*, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). However, DCS points out that Parents did not raise their due-process claims before the trial court and asserts that Parents' arguments are therefore waived. Because Parents do not

deny that they failed to make their due-process claims in the trial court, we agree with DCS that they are waived. *See id*. at 180 ("It is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal.").

[15] Waiver notwithstanding, Parents have not convinced us that they were deprived of due process. Determining what process is due involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting use of the challenged procedure. *Id*. In addition, procedural irregularities in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights. *In re C.M.S.T.*, 111 N.E.3d 207, 212 (Ind. Ct. App. 2018). However, the "failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009); *see also In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) ("[T]he provision of family services is not a requisite element of our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal."). Furthermore, parents may not sit idly by without asserting a need or desire for services and then successfully argue that they were denied services to assist them with their parenting. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000).

[16] Here, Parents were offered a vast array of services, including: psychological assessments, parenting assessments, case-management services, individual counseling, homemaker services, supervised visitation, and family-centered treatment, the most intensive program available to DCS. Nonetheless, multiple service providers and FCMs testified that Parents were unable to benefit from any of the services provided by DCS. In fact, when Children were returned to Parents' care for a trial home visit, the condition of Parents' house began to deteriorate just as it had done twice before. Finally, regarding Mother's arguments as to what DCS "could have" done, *see* Mother's Br. pp. 32-33, we have previously held that if a parent feels the services are inadequate to facilitate the changes required for reunification, it is the parent's responsibility to request additional services or assistance from the court or DCS, *see Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007). In this case, Parents did not do so.

[17] In support of her due-process argument, Mother cites several passages from a report issued by the Child Welfare Policy and Practice Group (CWG). In January 2018, Indiana Governor Eric Holcomb asked CWG to assess the Indiana Department of Child Services. In June 2018, CWG issued a report making numerous findings regarding DCS. Mother acknowledges that she did not present this information to the trial court but asks us to take judicial notice of it on appeal pursuant to Indiana Evidence Rule 201(d). Indiana Evidence Rule 201(d) provides that judicial notice may be taken at any stage of the

proceeding, which includes appeals. *Banks v. Banks*, 980 N.E.2d 423, 426 (Ind. Ct. App. 2012), *trans. denied*.

[18] Some of the findings she cites could be considered "facts" and therefore are capable of being judicially noticed. For example, she states that CWG found that "while neighboring states experienced significant reductions in children being placed outside the home, during that same time period Indiana experienced an enormous increase in DCS placements of children outside the home." Mother's Br. p. 23 (citing The Child Welfare Policy and Practice Group, *Evaluation of the Indiana Department of Child Services*, June 18, 2018, *found at* http://www.in.gov/dcs/files/IndianaEvaluationReportCWGFinal.pdf (last visited Apr. 23, 2019)). Mother also asks us to take judicial notice of various provisions from DCS's Child Welfare Policy Manual. For instance, she quotes a variety of statements from the "Values and Principles" section of DCS's Child Welfare Policy Manual:

- If a child is determined to be unsafe, DCS and the family will develop a timely plan to keep the child safe, with all efforts toward services to protect the child in his or her own home.

- Families will receive ongoing supports that will enable families to safely sustain their children in their homes.

- Vigorous early intervention services should be offered to at-risk families to enable a child to remain safely in his or her own home.

- Reunification and permanency is accelerated when visitation between parents and children is frequent and in the most normalized environment possible.

Ind. Dep't of Child Servs. Child Welfare Pol'y Manual, Ch. 1, Sec. 0, www.in.gov/dcs/files/1.00%20Introduction.pdf (last visited Apr. 23, 2019) (quoted in Mother's Br. pp. 31-32).

[19] The problem with Mother's argument is that, even if we were to take judicial notice of the statements she cites, *see*, *e.g., In re D.H.*, Case No. 18A-JT-1861 (Ind. Ct. App. Feb. 1, 2019) (Petition to Transfer due May 10, 2019), Mother does not tell us how these "facts" show a due-process violation **in this case**. That is, she does not connect these "facts" to this case. As these "facts" are meaningless in a vacuum, we see no need to take judicial notice. *See Banks*, 980 N.E.2d at 426 (this Court need not take judicial notice when its review of the record "actually presented to the trial court leaves us with sufficient information to affirm its decision").

## II. Children's Constitutional Rights

[20] Next, Mother contends that the trial court should have appointed Children their own legal counsel ("expressed-interest advocacy" Mother's Br. p. 34) for purposes of the termination proceedings. Specifically, she argues that not appointing Children their own legal counsel violates the due-process and equal-protection clauses of the Fourteenth Amendment to the United States Constitution as well as Article 1, Sections 12 (due course of law) and 23 (privileges and immunities) of the Indiana Constitution. She acknowledges that

she did not make this argument to the trial court but asserts that "[i]t was fundamental error for the juvenile court to not appoint counsel to represent [Children]." Mother's Br. p. 34. The fundamental-error doctrine applies to egregious trial errors. *In re E.E.*, 853 N.E.2d 1037, 1043 (Ind. Ct. App. 2006), *trans. denied*. In order for this Court to reverse based on fundamental error, the error must have been a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and appear clearly and prospectively. *Id.*

[21] At the outset, Mother recognizes that providing children "expressed-interest advocacy" in termination proceedings "is an issue of first impression in Indiana" *Id.* at 34. Indeed, there is no authority in Indiana requiring that children be appointed their own legal counsel in termination proceedings. Indiana Code section 31-35-2-7(a) states that if a parent objects to the termination of the parent-child relationship, the court shall appoint a guardian ad litem, a court-appointed special advocate, or both for the child. Here, the trial court did exactly that and appointed GAL Webber, a licensed attorney, to represent and protect the best interests of Children. *See* Ind. Code § 31-32-3-6. Next, even if we were to hold that appointment of counsel is required, Mother has not directed us to any evidence suggesting that the lack of counsel for Children **in this case** created an unfair proceeding. Due process has never been defined, but the phrase embodies a requirement of "fundamental fairness." *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011). Here, GAL Webber was appointed to represent Children's best interests, and P.G. (Children's foster parent) and Riley

Powell (Bran.M.'s therapist) both testified about Children's need for structure and consistency. As such, we do not see any error, let alone fundamental error, in the trial court not appointing Children their own legal counsel.

# III.  Sufficiency

[22]  When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id*. When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id*. To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[23]  A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[24] First, Parents argue that there is insufficient evidence to support the trial court's conclusion that the conditions resulting in Children's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to their placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[25] Here, Parents failed to demonstrate that they were any closer to providing Children a safe, clean home than they were at the beginning of the CHINS case. The evidence shows that Parents were unable to benefit from services,

some of which were very intensive, to reunite with Children and that as soon as Children returned to Parents' care for a trial home visit, the home's conditions went back to the way they were when Children were removed the first time. As such, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied.[2]

[26] Next, Parents argue that the trial court erred in concluding that termination is in Children's best interests. To determine what is in the children's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the children. *Id*. The trial court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *Id*. We have previously held that the recommendation by both the DCS case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is clear and convincing evidence that termination is in the best interests of the children. *Id*. at 1158-59.

---

[2] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Children's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationships pose a threat to the well-being of Children. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.

Here, in addition to Parents' inability to maintain a clean house and safe environment for Children that necessitated DCS involvement and their lack of progress since then, FCM Boolman and GAL Webber testified that terminating Parents' parental rights would serve the best interests of Children. *See* Tr. pp. 195, 245. Furthermore, the trial court found that Children have been removed from Parents' care for nearly three years and that "they need permanency." Mother's App. Vol. II p. 73. Therefore, the trial court did not err when it determined that termination is in Children's best interests. *See also In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships").

Finally, Father challenges the trial court's conclusion that there is a satisfactory plan for Children's care and treatment. In order for the trial court to terminate a parent-child relationship, it must find that there is a satisfactory plan for the care and treatment of the child. Ind. Code § 31-35-2-4(b)(2)(D). That plan need not be detailed, so long as it offers a general sense of the direction the child will go after the parent-child relationship is terminated. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007), *trans. denied*. Adoption is generally a satisfactory plan, even when a potential adoptive family has not been identified. *See id.* at 375. Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to decide whether an adoptive placement is appropriate. *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), trans. denied.

[29] Here, DCS's plan is adoption. FCM Boolman and GAL Webber agreed with this plan. Father contends that because the "foster parents had not decided whether they wanted to adopt [Children]" and "there is no guarantee that [Children] will remain together," adoption is not a satisfactory plan. Father's Br. pp. 20-21. However, adoption is not an unsatisfactory plan even if DCS has not identified a specific family to adopt Children and even if the plan were for Children to have separate adoptive homes. *See In re A.S.*, 17 N.E.3d at 1007. Accordingly, the trial court did not err in concluding that adoption is a satisfactory plan for Children.

[30] Affirmed.

Mathias, J., and Crone, J., concur.